John SENTER, Plaintiff-Appellant, Cross-Appellee,

v.

GENERAL MOTORS CORPORATION, Defendant-Appellee, Cross-Appellant.

Nos. 75–1264, 75–1265.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1975.

Decided March 1, 1976.

Charles P. Pfarrer, Cowden, Pfarrer, Crew & Becker, Joseph P. Buchanan, Dayton, Ohio, Russell J. Thomas, Jr., General Motors Corp., Detroit, Mich., for General Motors Corp.

Ted W. Rice, Dayton, Ohio, for John Senter.

Before CELEBREZZE and PECK, Circuit Judges, and HARVEY, District Judge.*

CELEBREZZE, Circuit Judge.

This is an appeal from a class action brought under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. (1970).[1] Appellant John Senter appeals from the judgment of the District Court that his discharge from employment at General Motors' Inland Division was not in retaliation for filing charges with the Equal Employment Opportunity Commission alleging discrimination in Inland's promotional procedures. General Motors cross-appeals from the Court's finding that they had discriminated against minority employees by denying them equal opportunity for promotion. Our jurisdiction is based upon 42 U.S.C. § 2000e–5(f)(3) (1970).

John Senter is a black male who was employed at General Motors Inland Division in Dayton from 1967 until his discharge in 1973. During his period of employment, he did not at any time occupy a supervisory position. While an employee at Inland he was a member of Local 87 of the United Rubber, Cork, Linoleum & Plastic Workers of America. In 1969, he was elected as an Alternative Committeeman authorized to represent employees in grievance procedures when the regularly elected Committeeman was not present in the plant. It was in this capacity that his troubles with Inland began. He apparently took his duties quite seriously and became involved in three disciplinary incidents.

The only incident which has any relevancy to this appeal occurred in June of 1970. On June 8, 1970, Appellant endeavored to present a "Group Grievance" on grievance forms provided by management. The grievance charged General Motors with discriminating against its minority employees in making promotions to supervisor. The

* Hon. James Harvey, United States Judge for the Eastern District of Michigan, Southern Division, sitting by designation.

1. The District Court opinion is reported at 383 F.Supp. 222 (S.D.Ohio 1974).

grievance was not properly submitted and the foreman's response was to deny the grievance. Appellant was directed to withdraw the grievance and when he refused he was suspended. He subsequently withdrew the grievance and submitted another document entitled "Employee Grievance" on a plain sheet of paper. He was apparently induced to withdraw the first grievance on the assumption that his second grievance would receive attention. It did not. The District Court found that it received, at most, perfunctory attention and was dismissed as non-grievable. The District Court concluded that the disciplinary action taken against Appellant was in retaliation for his efforts to present a grievable issue of racial discrimination in accordance with the collective bargaining agreement then in effect.[2] Appellant was less successful in convincing the District Court that his suspensions and his discharge represented a pattern of retaliation for his complaint to the EEOC.[3]

After exhausting the proper administrative remedies, Appellant brought a class action in the District Court seeking a permanent injunction restraining Appellee from denying him and other blacks the opportunity for promotion to supervisory positions because of their race. The class he sought to represent included himself and other blacks in non-supervisory positions who were qualified for supervisory positions and wanted such positions. At trial, the Court received a great deal of evidence, most of it of a statistical nature, detailing the operation and effect of Appellee's promotional system. The District Court concluded that the current promotional procedures at Inland, entitled Selective Training Education Affirmative Management or STEAM, were nondiscriminatory.[4] However, the Court also concluded that the system for making promotions prior to the inception of the STEAM program in 1971 had resulted in discrimination against black employees by denying them an equal and nondiscriminatory opportunity to qualify for promotion.[5]

The issues on appeal may logically be divided into two categories: the first concerns Appellant's personal claims against Appellee, and the second involves the claims he seeks to raise on behalf of the class. General Motors has not challenged the District Court's finding that its June 1970 suspension of Appellant for refusing to withdraw his grievance was discriminatory. That is therefore not an issue on appeal. *Morley Construction Co. v. Maryland Casualty Co.*, 300 U.S. 185, 191, 57 S.Ct. 325, 327, 81 L.Ed. 593, 597 (1937).

■ Appellant claims that the District Court erred in its conclusion that he had failed to prove by a preponderance of the evidence that his discharge from Inland violated 42 U.S.C. § 2000e–3(a) (1970). After review of the record, we are convinced that the District Court's finding that Appellant's suspensions and discharge after June 1970 were not in retaliation for his continued protests against discrimination at Inland is supported by substantial evidence. Since the findings were not clearly erroneous this portion of the District Court opinion is affirmed. *See Miller v. United States*, 522 F.2d 386, 387 (6th Cir. 1975) (per curiam).

We now turn to an examination of the issues sought to be raised by Appellant on behalf of the class.

### STANDING

■ Initially, General Motors challenges Mr. Senter's standing to maintain this suit as a class action. Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354, 43 U.S.L.W. 4906, 4908 (1975). "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between

2. *Id.* at 228.

3. *Id.*

4. *Id.*

5. *Id.*

himself and the defendant within the meaning of Art. III." *Id.* Generally, standing is not granted to vindicate the rights of third parties. *See Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). Nor is it sufficient that a complaint assert a "generalized grievance." *See Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216–27, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706, 715 (1974). *See also Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947, 965 (1968). A Plaintiff must allege "such a personal stake in the outcome of the controversy" as to warrant his invocation of the federal court's jurisdiction. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962). *See also Warth v. Seldin, supra,* 422 U.S. at 496, 95 S.Ct. at 2204, 45 L.Ed.2d at 353, 43 U.S.L.W. at 4908. The accepted test for standing is one of "injury in fact",[6] *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 151–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184, 188 (1970), and a court's jurisdiction may be invoked only where the complaint alleges that the Plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536, 540 (1973). However, once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants. *See United States v. SCRAP, supra* 683–90, 93 S.Ct. 2413, 37 L.Ed.2d 267.

■ This Court has taken a broad view of standing in Title VII actions. *Tipler v. E. I. duPont deNemours and Co.,* 443 F.2d 125, 130 (6th Cir. 1971). *See also Roberts v. Union Co.,* 487 F.2d 387, 389 (6th Cir. 1973). *Cf. Blue Bell Boots, Inc. v. EEOC,* 418 F.2d 355 (6th Cir. 1969). Standing for purposes of the Civil Rights Act of 1964 was intend-

ed by Congress to be defined as broadly as permitted by Article III of the Constitution. *See Rosen v. Public Service Electric and Gas Co.,* 477 F.2d 90, 94 (3d Cir. 1973); *Huff v. N. D. Cass Co.,* 485 F.2d 710 (5th Cir. 1975); *Hackett v. McGuire Bros., Inc.,* 445 F.2d 442, 446–47 (3rd Cir. 1971). *See generally Trafficante v. Metropolitan Life Ins.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415, 419 (1972). Judge Gibbon in *Hackett v. McGuire Bros., Inc., supra,* aptly described the proper scope of the standing doctrine in litigation under Title VII:

> The national public policy reflected . . . in Title VII of the Civil Rights Act of 1964 . . . may not be frustrated by the development of overly technical judicial doctrines of standing or election of remedies. If the plaintiff is sufficiently aggrieved so that he claims enough injury in fact to present a genuine case or controversy in the Article III sense, then he should have standing to sue in his own right and as a class representative.

445 F.2d at 446–447. Taking a broad view of standing in Title VII litigation is consistent with the clear weight of authority in other jurisdictions. *See e. g. Hadnott v. Laird,* 149 U.S.App.D.C. 358, 463 F.2d 304, 311, n. 21 (1972); *Carr v. Conoco Plastics, Inc.,* 423 F.2d 57, 65 (5th Cir. 1970); *Graniteville Co. v. EEOC,* 438 F.2d 32, 36 (4th Cir. 1971). It is also in keeping with the unique enforcement structure of the 1964 Civil Rights Act which relegates much of the responsibility for vindicating the policies of the Act to private litigants.[7] *See Williamson v. Bethlehem Steel Corp.,* 468 F.2d 1201, 1204 (2d Cir. 1972); *Jenkins v. United Gas Corp.,* 400 F.2d 28 (5th Cir. 1968). *See generally Trafficante v. Metropolitan Life Ins., supra* at 409 U.S. 209–11, 93 S.Ct. at 366, 34 L.Ed.2d at 419; *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

---

**6.** We see no need to apply the "zone of interest" test to the facts of this case. *See United States v. SCRAP,* 412 U.S. 669, 686, n. 13, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254, 269 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 733 n. 5, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636, 642 (1972).

We note in passing however, that the interests asserted by Appellant in his complaint unquestionably fall within the parameters of Title VII.

**7.** 42 U.S.C. § 2000e–5(f)(1) (1970).

Of course, it is not sufficient that an aspiring class representative allege purely personal injury at the hands of the defendant, to have standing to sue on behalf of the class he must be a member of the class and suffer injury common to the class. *Garrett v. City of Hamtramck,* 503 F.2d 1236, at 1244–1245 (6th Cir. 1974).

Appellee contends that Appellant is not a member of the class of minority non-supervisory employees who were denied equal promotional opportunity. Appellee notes that Appellant had several opportunities for promotion to supervision and rejected them. Three members of Inland's management testified that they had each discussed the possibility of promotion with Appellant, and that he had either displayed a lack of interest in personal advancement[8] or had rebuffed the suggestion out of fear that promotion to the salaried ranks would expose him to discharge.[9] Appellee argues that Appellant had not been injured by the promotional policies of which he complains and therefore, he should not be granted standing to raise the issue on behalf of the class.

There are significant difficulties with Appellee's argument. The first is that there is evidence in the record that Appellant did desire promotion to supervisor and, in fact, was considered for the position and turned down.[10] There is also a conflict between

8. Mr. McDonald testified that he met with Appellant on June 19, 1970 to present the company's disposition of the plain paper grievance Appellant had submitted. Record at 403–405. He testified that their conversation began as a general discussion of the promotion situation at Inland but then changed into a discussion of Appellant's personal ambition:

. . . [A]s a further effort to pinpoint what was really bothering Mr. Senter, I asked him if he would be willing if I would make arrangements for him personally with Mr. Dunkelman who was then top executive in the Salary Employment Section, if I would make an appointment for him to have an interview with Mr. Dunkelman, and as I recall, Mr. Senter very quickly pushed me off and said his complaint was not being presented for him. He was not at that time interested in becoming a foreman or member of supervision. . . .

Record at 404. In response to a question from the Court, Mr. McDonald repeated his earlier testimony:

I did everything I thought I was capable of doing and trying to explore from John what he was really after and what I could do to be of some assistance to have him given whatever consideration he wanted. . . . I was unsuccessful in getting John to arrange to have an interview with Mr. Dunkelman.

. . .

Record as 415.

Mr. Stallings testified that Appellant had told him during their conversation in May 1973 that he had no specific interest in the foreman training program and that he felt he could better serve black people out in the factory. Record at 474.

9. Mr. Ballings testified that Appellant had told him in May or June 1971 that,

at the time he didn't feel like he could get into management because there were people he didn't trust in management, and he felt

like if he got into the salary ranks, it is possible to be fired and not have the representation you would have if you were an hourly person in the Union, and secondly that it might be selling out to some principles or a cause that he believed in, and he didn't feel he could do that.

Record at 517.

At trial Appellant explained his reluctance to accept promotion during cross-examination:

A. . . . [T]hey could theoretically get me out, promote me and fire me.

Q. Was there any specific reason why you entertained that fear?

A. Yes, because during the course of a conversation with a foreman of mine, Dominic Stoffle, he told me that he had been in a meeting . . . with members of my immediate supervision, and he told me point blank and frank, he said, "John, I made the suggestion that we promote you and then fire you just to get rid of you. Don't even worry about how to handle you, just promote you and fire you" and so I laughed it off, but it stuck in the back of my mind and remembered it.

Q. Was it said in jest?

A. Well, he told me this actually had occurred. He made this statement in this meeting. I didn't consider it a jest, you know.

. . . . .

Q. You did not?

A. No, sir.

Record at 119.

10. Appellant testified that he was interested in becoming a foreman, record at 37,118, and that he had communicated his interest to Mr. Newsome, then Inland's Director of Personnel, during a conversation in August 1970. Record at 169. A short time afterward he learned that he had been considered for a promotion, presumably on Mr. Newsome's initiative, and had been turned down. Record at 170. Mr. Newsome did not testify at trial.

the testimony of Appellant and that of Richard McDonald, a former member of Inland's Labor Relations staff, regarding their conversation on June 19, 1970.[11] This is a factual dispute beyond our competence to resolve.[12]

Secondly, the conversations between Appellant and James Stallings and Joseph Ballings, during which Appellant's promotional opportunities were discussed, occurred *after* Appellant had filed his complaint with the EEOC alleging discrimination in Inland's promotional practices.[13] Prior to June 1970 when he filed his "group" grievance, Appellant testified that no one in management had ever approached him to discuss possible promotion. The inference is clear that the sudden surge in interest concerning John Senter's qualifications for supervision after that date is linked to his continuing assault on Inland's promotional policies.

The timing of the Ballings conversation is particularly troublesome since it occurred after Appellant's complaint to the EEOC yet before the date that the lawsuit was filed. However, we cannot accept Appellee's contention that an offer of promotion following complaint to the EEOC affected Appellant's standing to raise the class issue. Before an employee may bring a civil suit under the Act he must exhaust certain avenues of administrative relief.[14] *Love v. Pullman Co.*, 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679, 682 (1971). It would be anomalous to hold that an employee, in the process of exhausting administrative remedies, should lose standing to contest the very practices of which he complained in his charge to the EEOC merely because his employer, in the interim, offers him a promotion which he rejects. If an employer may negate an employee's standing to challenge discriminatory employment practices by the simple expedient of offering him unilaterally the relief he seeks for the class, the individual-initiated enforcement structure of Title VII is seriously threatened. In *Jenkins v. United Gas Corp.*, 400 F.2d 28, 30 (5th Cir. 1968), the Fifth Circuit rejected a similar argument and held that the acceptance of a promo-

11. Appellant vigorously disputes Mr. McDonald's testimony that they had discussed his personal promotion to supervisor during their September 19, 1970 conversation. Record at 177–80. He testified that the sole topic of conversation was the disposition of his grievance and his suspension for refusing to withdraw the grievance. Record at 179. He also testified that he had told Mr. McDonald that he had filed the grievance on his own behalf as well as for other black and minority employees. Record at 181.

12. Resolving conflicts in testimony is not the function of an appellate court. Appellee raised the standing issue in a memorandum submitted following the close of all evidence at the District Court's request. Although the Judge did not address the standing issue directly, he did resolve it by implication when he found that the action could proceed on a class basis with Appellant as representative. While this Court is not bound by the legal conclusions of the court below, we are extremely hesitant to reexamine conflicting testimony and generally defer to the District Court if there is any factual support in the record. *See United States v. Upthegrove*, 504 F.2d 682, 686 n. 8 (6th Cir. 1974).

13. Appellant filed a complaint with the EEOC on December 9, 1970. His discussion with Mr.

Ballings occurred in May or June of 1971. Record at 516. On November 26, 1971 he filed a complaint in the District Court following the statutorily mandated period for conciliation and exhaustion of administrative avenues of relief. It was not until May 1973 that James Stallings approached Appellant to discuss a possible promotion.

Since Appellant's meeting with Stallings did not occur until after the suit was filed, it is irrelevant for determining standing to sue. *Roe v. Ferguson*, 515 F.2d 279 at 281 (6th Cir. 1975).

14. In order to properly invoke the jurisdiction of the District Court, a person claiming to be aggrieved must initiate proceedings in the state administrative system, 42 U.S.C. § 2000e–5(c) (1970), file a charge of discrimination with the EEOC, 42 U.S.C. § 2000e–5(f)(1) (1970), await that agency's determination that there is reasonable cause to believe that the charge is true, *id.*, that the problem may not be solved by negotiation and conciliation, *id.*, and that the suit should be brought by the private litigant rather than the EEOC. *Id.* Built into the enforcement procedures are carefully constructed time delays designed to allow for the exploration of alternative avenues of relief short of invoking the court's jurisdiction.

tion, subsequent to the filing of a complaint alleging systematic racial discrimination, does not moot the individual claim or that of the class. Other courts have followed *Jenkins* in refusing to deny a plaintiff standing to raise individual and class issues after acceptance of post-complaint benefits. *See Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 426 (8th Cir. 1970) (offer of employment to plaintiff and other blacks cannot change fact of discrimination in hiring prior to that time); *Rosen v. Public Service Electric and Gas Co., supra* at 94, and *Hackett v. McGuire Bros., supra* at 446 (acceptance of pension does not deprive plaintiff of standing to attack alleged discrimination in pension plan.) Similarly, it has been held that reforms after-the-fact do not moot questions already presented for review. *See e. g., Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 442 (5th Cir. 1974). *See generally United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303, 1308 (1953).

■ Here, unlike *Jenkins,* Appellant did not accept the promotional opportunities offered him. He continues to pursue his complaint against Inland's allegedly discriminatory promotional practices, first with the EEOC, then in the District Court, and now before this Court. Also there was nothing to prevent Appellant while he remained a non-supervisory employee at Inland from seeking promotion at a later time when his relationship with his employer was less strained. Appellant's discharge from Inland in 1973 does not affect his standing to challenge Inland's promotion procedures. Standing is determined as of the date the suit is filed. *Roe v. Ferguson,* 515 F.2d 279, at 281 (6th Cir. 1975). Since Appellant was a black non-supervisory employee on the date the suit was filed,[15] he has standing to raise the issue of alleged discrimination by Appellee in the selection of supervisors. *See Moss v. Lane, Inc.,* 471 F.2d 853, 855 (4th Cir. 1973); *Brown v. Gaston County*

*Dyeing Machine Co.,* 457 F.2d 1377 (4th Cir. 1972).

## THE CLASS ACTION

■ Although we have determined that Appellant has standing to raise issues generally applicable to the class, we now turn to the question of whether the case could properly proceed as a class action. Not every suit alleging employment discrimination is suitable for class action treatment. *See Pointer v. Sampson,* 62 F.R.D. 689, 696 (D.D.C.1974); *Kinsey v. Legg Mason & Co.,* 60 F.R.D. 91, 98 (D.D.C.1973). A plaintiff must show that the action satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. *See Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496 (5th Cir. 1968). *See also Jackson v. Cutter Laboratories, Inc.,* 338 F.Supp. 882, 886 (E.D.Tenn. 1970); *King v. Ga. Power Co.,* 295 F.Supp. 943, 948 (N.D.Ga.1968).

Before we proceed to the issue of this action's maintainability under Rule 23, we must address Appellee's claim that Appellant improperly pled this suit as a class action. Appellee notes that the complaint fails to satisfy the prerequisites of 23(a) and does not identify whether the action is brought under 23(b)(2) or (b)(3). Appellee states that at no time prior to commencement of the trial did Appellant urge the court below to make a preliminary determination of the appropriateness of the class action. In support Appellee cites 23(c)(1) which states:

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained.

■ This Court has held that the language of this provision is mandatory and the District Court has a duty to certify the class action whether requested to do so or not. *Garrett v. City of Hamtramck,* 503 F.2d 1236 at 1243 (6th Cir. 1974). *See also*

---

**15.** This fact clearly distinguishes this case from *Heard v. Mueller,* 464 F.2d 190 (6th Cir. 1972). There the Court held that the plaintiff would not be an adequate representative of a class consisting of active employees of the defendant since, at the time the class action motion was filed, he was no longer an active employee, nor did he contest his discharge or seek reinstatement. *Id.* at 194.

*EEOC v. Detroit Edison Co.,* 515 F.2d 301 at 310 (6th Cir. 1975); *See generally* 3B J. Moore, Federal Practice ¶ 23.50 at 23–1101 (2d ed. 1974) [hereinafter Moore]. The District Court did not certify the action as a class action until its decision on the merits. The language of Rule 23(c)(1) is obviously directed to the District Court. It does not impose upon a plaintiff the additional burden of ensuring that the District Court adhere to 23(c)(1)'s directive. *See Rodriguez v. East Texas Motor Freight,* 505 F.2d 40, 50 (5th Cir. 1974). *Cf. EEOC v. Detroit Edison Co., supra,* 515 F.2d at 309.

▇ It is also irrelevant that Appellant did not directly refer to Rule 23 in his complaint. As we have previously stated, it is not essential that an action under Title VII be labeled a class action since it is "perforce a sort of class action for fellow employees similarly situated." *Tipler v. E. I. duPont deNemours and Co., supra* at

130.[16] Here there is no question but that the suit was filed as a class action and it proceeded to trial as a class action. The description of the class affected by the alleged employment discrimination in the complaint and the scope of the relief requested clearly indicate that the suit was intended to benefit the entire class.[17] Appellant was not misled in this regard. In a motion to dismiss Appellant's original complaint, Appellee indirectly admitted that the suit was brought as a class action.[18] Further, Appellant identified the suit as a class action in his opening remarks at trial and Appellee responded by freely admitting that the suit had been filed as a class action.[19] Appellee also implicitly admitted the class nature of the action in a post-hearing memorandum submitted at the request of the District Court.[20] Finally, the trial court ruled that the case was maintainable as a class action in its decision on the mer-

16. Quoting *Jenkins v. United Gas Corp., supra* at 33.

17. The following excerpts from the amended complaint clearly indicate the class nature of the action:

 II.

 This is a proceeding for a permanent injunction restraining Defendant from maintaining a policy, practice, custom, and usage of denying Plaintiff and other Negroes the opportunity for promotion to supervisory positions because of their race.

 . . . . .

 V.

 Plaintiff and other Negroes in non-supervisory positions are qualified for supervisory positions and want said supervisory positions and such is known to Defendant. Defendant has in the past discriminated against said Negro employees in favor of white employees with respect to advancement opportunity and continues to do so. Defendant maintains a very small percentage of Negroes in supervisory job categories and has no adequate plan for increasing that percentage.

 Wherefore, Plaintiff respectfully prays this Court to advance this case on the docket, order a speedy hearing at the earliest practicable date, cause this case to be in every way expedited and upon such hearing:

 1. Have a permanent injunction issue enjoining Defendant, its agents, successors, employees, attorneys and those acting in concert with it and at its direction from continuing or maintaining the policy, practice, custom and usage of discriminating against qual-

ified Negro employees with respect to their advancement to supervisory job positions in the company because of their race.

 2. Award Plaintiff and all others similarly situated all losses in wages they have suffered as a result of their discriminatory exclusion from advancement opportunity in Defendant company.

 3. Order that Defendant develop as soon as practicable an affirmative program for the advancement of its Negro employees to supervisory positions.

18. The third argument in support of Appellee's motion to dismiss the original complaint was that Appellant had failed to plead facts which would allow the action to be maintained as a class action under Rule 23. This, of course, recognizes that the suit was filed on behalf of the class described in the complaint. Also, Appellee admitted in its answer to the amended complaint that the complaint sought a permanent injunction against class-wide discrimination although it denied the substance of the averments in paragraph II of the amended complaint. *See* note 17 *supra.*

19. Record at 4, 6.

20. At the close of the trial, the District Judge submitted various questions to counsel that he wanted briefed. Question No. 5 was: "How should the class in this action be described"? Appellee extensively briefed the broader issue of whether the suit may be maintained as a class action at all.

its. In *Bing v. Roadway Express, Inc.,* 485 F.2d 441, 446–47 (5th Cir. 1973), the Court held that the trial court's implicit determination of the class action question sufficed in a Title VII suit in which all the parties proceeded on the assumption that the action was a class action, despite the fact that no hearing was held and no order was entered under Rule 23(c)(1). *See also Lau v. Nichols,* 483 F.2d 791, 793 n. 4 (9th Cir. 1973), *rev'd on other grounds* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Castro v. Beecher,* 459 F.2d 725, 731 (1st Cir. 1972).

■■■ The proper procedure, of course, would have been for Appellant's attorney to indicate in the complaint that the suit was brought as a class action under Rule 23 and to identify the relevant subheading of the rule. Also, the District Court should have ruled on the maintainability of the class action "as soon as practicable" after commencement of the action. However, the simple fact is that no one was misled as to the class nature of the action. To state at this late date that this was not a class action, "would be to ignore the substance of the proceedings below in favor of an excessively formalistic adherence to the Federal Rules of Civil Procedure." [21] *Bing v. Roadway Express, Inc., supra* at 447. Pleading

under the Federal Rules is designed to give notice to the Court and other parties of the nature of the action and the relief sought. *See generally Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957). We believe that the spirit, if not the letter, of pleading a class action under Rule 23 was complied with and the class action issue is properly before this Court.

■■■ The burden is on Appellant, the party seeking to utilize the class action device, to establish his right to do so. *See Davis v. Romney,* 490 F.2d 1360, 1366 (3rd Cir. 1974); *Cook County College Teachers, Local 1600, AFT v. Byrd,* 456 F.2d 882, 885 (7th Cir. 1972). *See generally* Moore ¶ 23.-02–2 at 23–156. As a preliminary matter, he must satisfy all four of the prerequisites contained in Rule 23(a) [22] and then demonstrate that the class he seeks to represent falls within one of the subcategories of Rule 23(b). [23] *See* Moore ¶ 23.03 at 23–228.

■■■ The first requirement of 23(a)(1) is that "the class is so numerous that joinder of all members is impracticable . . . ." Fed.R.Civ.P. 23(a)(1). Appellee argues that Appellant at trial only identified sixteen black employees who he claimed should have been promoted to supervisory positions. Appellee claims that

---

21. The clear trend is to read Rule 23 functionally rather than formalistically in Title VII litigation. *See e. g., Tipler v. E. I. duPont deNemours and Co., supra* at 130; *Sprogis v. United Airlines,* 444 F.2d 1194, 1201 (7th Cir. 1971); *Hutchings v. U. S. Indus. Inc.,* 428 F.2d 303, 310 (5th Cir. 1970); *Jenkins v. United Gas Corp., supra* at 33.

22. (a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

23. (b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b).

this number does not warrant the conclusion that joinder would be impractical.[24] However, Appellee is confusing evidence presented at trial on the merits with the altogether different question of whether there are facts alleged which would justify the case going to trial as a class action. Normally class certification will occur at a much earlier stage of the proceedings than it did in this case. *See* Fed.R.Civ.P. 23(c)(1). In ruling on a class action a judge may consider reasonable inferences drawn from facts before him at that stage of the proceedings, and an appellate court will generally defer to the District Court's determination that a class is sufficiently numerous to make joinder impracticable. *See Hill v. American Airlines, Inc.,* 479 F.2d 1057, 1059 (5th Cir. 1973); *Cypress v. Newport News Gen'l & Nonsectarian Hosp. Ass'n.,* 375 F.2d 648, 653 (4th Cir. 1967). *See also Carey v. Greyhound Bus Co., Inc.,* 500 F.2d 1374 (5th Cir. 1974). Here the Judge determined that the definable class of persons for whom the action may be maintained consisted of all black employees who, during a period between July 2, 1965 and September 1, 1971,[25] were denied an opportunity for promotion to supervisory positions although possessing seniority and qualifications equivalent to white employees who were so promoted. During this period blacks comprised approximately fourteen percent of the work force at Inland.[26] It would be reasonable to infer that a substantial number of these individuals are includable in the class eligible for relief

on the basis of Appellant's action and that their joinder would be impracticable.

A plaintiff must also show that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). Appellee contends that Appellant has not claimed that any employment policy of Inland violates Title VII. This simply is not the case since the obvious thrust of Appellant's complaint is that Inland has engaged in a general pattern and practice of discriminating against minority employees in making promotions from the hourly to salaried ranks. Similar allegations have supported class actions under Title VII. *See e. g., Baxter v. Savannah Sugar Refining Corp., supra* at 442; *Rowe v. General Motors Corp.,* 457 F.2d 348, 354 (5th Cir. 1972).

 Appellee characterizes this case as a collection of "highly individualized claims of black persons" and therefore not appropriate for class treatment. It notes that the District Court's order contemplates further proceedings to identify members of the class who are eligible for relief.[27] Appellee urges this Court to follow the lead of district courts which have not allowed discriminatory promotion cases to proceed as class actions on the ground that every promotional decision involves individual considerations which would have to be examined by a court before a finding could be entered on the Title VII issue. *See e. g. Patterson v. General Motors,* (N.D.Ill.1974); *White v. Gates Rubber Co.,* 53 F.R.D. 412, 413 (D.Colo.1971). *See also Gresham v. Ford Motor Co.,* 53 F.R.D. 105 (N.D.Ga.1970).[28]

24. There is no specific number below which class action relief is automatically precluded. Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case. *See Cash v. Swifton Land Corp.,* 434 F.2d 569, 571 (6th Cir. 1970). *See generally* Moore ¶ 23.05 at 23–278.

25. July 2, 1965 is the effective date of Title VII of the 1964 Civil Rights Act. September 1, 1971 is the date the District Court found was the approximate beginning date of the STEAM program.

26. *See* 383 F.Supp. at 223–4.

27. The District Court reserved decision on the award of back pay, the formula of computation

and the determination of the recipients. The opinion also stated that the determination of the damage sustained by independent members of the class should be referred to a Master in accord with Rule 53 of the Federal Rules of Civil Procedure. 383 F.Supp. at 228–29. *See* discussion note 33 *infra.*

28. These cases are clearly distinguishable. In *Patterson v. General Motors, supra,* the only acts complained of by plaintiff related to personal grievances with the company and union. The only allegation which related to the class claim was that the action was brought on behalf of minority workers who were employed or might have been employed by the defendant-company. In *Gresham v. Ford Motor Co., supra,* the plaintiff once again only alleged per-

However, acceptance of this line of reasoning would mean that no cases alleging discrimination in hiring or promotions could be maintained as class actions. It is manifest that every decision to hire, fire or discharge an employee may involve individual considerations. Yet when that decision is made as part of class-wide discriminatory practices, courts bear a special responsibility to vindicate the policies of the Act regardless of the position of the individual plaintiff. *See Hutchings v. United States Indus. Inc., supra* at 311; *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 715 (7th Cir. 1969). Factual identity between the plaintiff's claims and those of the class he seeks to represent is not necessary. *See Johnson v. Ga. Hwy. Express, Inc., supra* at 1125; *Jenkins v. United Gas Corp., supra* at 33–35.

 Race discrimination is peculiarly class discrimination. *See Tipler v. E. I. duPont deNemours and Co., supra* at 130. The operative fact in an action under Title VII is that an individual has been discriminated against because he was a member of a class. *See Graniteville v. EEOC, supra* at 37. Here the question common to the class is whether Appellee's procedures for making promotions have resulted in discrimination against its minority employees. *See Norwalk Core v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2d Cir. 1968). *See also* Moore ¶ 23.06–1 at 23–302–03. Once it has been shown that the class has been discriminated against, it is then incumbent on each member of the class to show that he has suffered personal loss. In *Baxter v. Savannah Sugar Refining Corp., supra* at 443–44, the Fifth Circuit commented on the bifurcated nature of a Title VII class action:

A Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the *class* to establish that an employer's employment practices have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the *class* of black employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the class, has suffered financial loss, and thus entitled to back pay or other appropriate relief. [Emphasis in ·the original].

Appellant's complaint was not restricted to himself alone but alleged that promotional discrimination had been practiced across the board. This satisfied the common question requirement of Rule 23(a)(2). *See Tipler v. E. I. dePont deNemours and Co., supra* at 130; *Reed v. Arlington Hotel Co.,* 476 F.2d 721, 723 (8th Cir. 1974); *Carr v. Conoco Plastics, Inc., supra* at 63; *Johnson v. Ga. Hwy. Express, supra* at 1124.

 The other prerequisites of 23(a) are that the claims of the representative are typical of those of the class [29] and that he will fairly and adequately protect the interests of the class.[30] In large measure we have already dealt with these questions in our discussion of standing, however a few additional observations would appear appropriate. There are two criteria for de-

sonal grievances against his employer. The court noted that this was not a case where an employer allegedly refuses to hire broadly. *Id.* at 106. In this case, however, the complaint alleges that Inland has pursued a broad practice of discrimination in promotions to supervisor. In *White v. Gates Rubber Co.,* the plaintiff made a general accusation of discrimination in all facets of defendant's employment practices without any further specification. Here the

charge specified Inland's promotional practices. Even if this case is not distinguishable on its facts, the District Court in that case took an unnecessarily restrictive view of the law which this Court declines to follow. *See* discussion in text *infra.*

**29.** Fed.R.Civ.P. 23(a)(3).

**30.** Fed.R.Civ.P. 23(a)(4).

termining whether the representation of the class will be adequate: 1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Gonzales v. Cassidy,* 474 F.2d 67, 73 (6th Cir. 1973). *See generally* Moore ¶ 23.07[2] at 23–371. Appellant was a member of the class at the time the suit was filed and to that extent his claims are typical.[31] Class membership is also relevant to the question of common interest although it is not dispositive. Appellant's interests have not been shown to be antagonistic to those of the class. *See generally Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). It would appear that Appellant's interests are coextensive with those of the class on all issues which relate to the class.[32] The second criterion is also met. This case comes to us after trial on the merits where Appellant prevailed on the class issues. Appellant has demonstrated to our satisfaction that he may adequately represent the interests of the class.[33]

▮▮▮▮ Even though this Court finds that the prerequisites of 23(a) are satisfied, our inquiry does not end because we must next determine whether or not the action is maintainable as a class action under any of the subdivisions contained in Rule 23(b). In the vast majority of Title VII cases, courts have normally permitted the action to proceed under Rule 23(b)(2) or 23(b)(3) if the case is otherwise appropriate for class action treatment. Although the trial court did not specify the subsection under which the class action could be maintained it made findings which would support either a (b)(2) or (b)(3) action.[34] From a review of the complaint, it appears that suit was brought under Rule 23(b)(2) alleging that General Motors, by virtue of its discriminatory promotional practices, had "acted or refused to act on grounds generally applicable to the class . . . ."[35] Fed.R.Civ.P. 23(b)(2). Appellant's primary prayer was for injunctive relief and the additional request for back pay does not preclude certification as a 23(b)(2) class action. *See Petteway v. American Cast Iron Pipe Co., supra* at 256–57. Lawsuits alleging class-wide discrimination are particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive remedy. *See e. g., Jenkins v. United Gas Corp., supra* at 32–35. The Advisory Committee for the 1966 revision of Rule 23 offered as an illustration of a 23(b)(2) class action a civil rights case "where a party is charged with discriminating unlawfully against a class, usually one

---

**31.** To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law. *See Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562–63 (2d Cir. 1968). *See also Bateman v. Retail Credit Corp..* 320 F.Supp. 1115, 1116 (N.D.Ga.1970). *See generally* Moore ¶ 23.07[2] at 23–371.

**32.** The District Judge carefully separated his discussion of Appellant's personal claims from those brought on behalf of the class. This was consistent with Rule 23(c)(4) which provides that an action may be brought and maintained as a class action with respect to particular issues. Fed.R.Civ.P. 23(c)(4)(A). This facilitates meeting the common interests requirement of 23(a)(4). *See* Moore ¶ 23.07[2] at 23–377.

**33.** Appellee has expressed doubts about Appellant's continued resolve to represent the interests of class members in the further proceedings contemplated by the District Court in its opinion. Our understanding of the nature of those proceedings, however, is that individual class members would come forward and demonstrate that they were personally injured by Appellee's discriminatory employment practices. This was precisely the procedure sanctioned by the Fifth Circuit in *Baxter v. Savannah Sugar Refining Corp., supra* at 443–44. We upheld a similar procedure in *United States v. Masonry Cont. Ass'n.,* 497 F.2d 871, 876 (6th Cir. 1974). As long as class-wide discrimination has been shown, the fact that back pay awards vary and are to be determined later is not relevant. *See also Petteway v. American Cast Iron Pipe,* 494 F.2d 211, 258 (5th Cir. 1974).

**34.** 383 F.Supp. at 225.

**35.** *See* text of complaint at note 17 *supra*.

whose members are incapable of specific enumeration." [36]

In summary, Appellant has satisfied the requirements of Rule 23 and is entitled to proceed with the class action. We now turn to the issue of whether the case was correctly decided on the merits.

■ The court below found that Appellant had shown by a preponderance of the evidence that Appellee had discriminated against its minority employees by denying them an equal opportunity to qualify for promotions.[37] Appellee contends that the record cannot support this conclusion. Our standard of review in this case is twofold. On issues of fact and credibility we are bound by the "clearly erroneous" principle of Rule 52(a) of the Federal Rules of Civil Procedure. *See Miller v. United States, supra* at 3. However, we are not so bound where the contention is that the district court applied erroneous legal principles. *See Sims v. Sheet Metal Workers Int. Ass'n Local 65,* 489 F.2d 1023, 1026 (6th Cir. 1973).

■ In *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163 (1971), the Supreme Court stated that "practices . . . neutral on their face . . . cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." This circuit has followed *Griggs* in striking down facially nondiscriminatory employment practices which have the practical effect of continuing past injustices. *See Palmer v. General Mills, Inc.,* 513 F.2d 1040, 1042 (6th Cir. 1975); *Afro American Patrolmen's League v. Duck,* 503 F.2d 294, 301 (6th Cir. 1974); *Sims v. Sheet Metal Workers Int. Ass'n, Local 65, supra* at 1026; *Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 879 (6th Cir. 1973).

The District Court found that Inland's promotional procedures had the practical effect of locking minority employees in the hourly ranks.[38] Appellee contends that this conclusion is invalid because the District Court improperly allocated the burden of proof when it considered statistical evidence as part of Appellant's prima facie case of discrimination thus shifting the burden of production to Appellee to justify its promotional procedures. Appellee submits that the Supreme Court established the proper order of proof in Title VII cases in *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). Appellee argues that a district court should not consider statistical evidence until after a plaintiff has established a prima facie case and the defendant has had an opportunity for rebuttal. At that point, according to Appellee, statistics could be introduced by plaintiff to indicate whether defendant's explanations of his conduct are genuine or pretextual.

We cannot accept so limited a role for statistical evidence in Title VII cases, nor do we believe that the Supreme Court intended to limit the use of statistical evidence by its decision in *McDonnell Douglas.* The issue in that case was the allocation and order of proof in a *private non-class action* challenging employment discrimination solely against the individual complainant.[39] The Court specifically disclaimed any intention of establishing a rigid order of proof in Title VII cases.[40] We rejected a similar argument in *Laugesen v. Anaconda Co.,* 510 F.2d 307, 312 (6th Cir. 1975), where this Court refused to adopt a literal reading of *McDonnell Douglas* in an age discrimination case. The only relevance of the Court's discussion of statistics in *McDonnell Douglas* to our inquiry is that they recognized the benefit of statistical evidence in demonstrating a "general policy and prac-

---

**36.** *See* Notes of the Advisory Committee on the 1966 Amendments to the Federal Rules of Civil Procedure, reprinted in Moore ¶ 23.01[10.–2].

**37.** 383 F.Supp. at 228.

**38.** *Id.* at 227.

**39.** 411 U.S. at 800, 93 S.Ct. at 1823, 36 L.Ed.2d at 676.

**40.** *Id.* at 802 n. 13, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

tice with respect to minority employment."[41]

Statistical evidence is an important tool for placing seemingly in-offensive employment practices in their proper perspective. *See, e. g., Johnson v. Goodyear Tire & Rubber,* 491 F.2d 1364 (5th Cir. 1974); *Afro American Patrolmen's League v. Duck, supra* at 299; *United States v. N. L. Indus.,* 479 F.2d 354 (7th Cir. 1973); *Brown v. Gaston County Dyeing Machine Co., supra; Spurlock v. United Airlines,* 475 F.2d 216 (10th Cir. 1972). Proof of overt racial discrimination is seldom direct. *See e. g., United States v. Jacksonville Terminal Co.,* 451 F.2d 418 (5th Cir. 1971); *Marquez v. Omaha District Sales Office, Ford Div.,* 440 F.2d 1157 (8th Cir. 1971). An employee is at an inherent disadvantage in gathering hard evidence of employment discrimination, particularly when the discrimination is plant-wide in scope. It is for this reason that we generally acknowledge the value of statistical evidence in establishing a prima facie case of discrimination under Title VII. *See Afro American Patrolmen's League v. Duck, supra* at 299; *United States v. Masonry Cont. Ass'n,* 497 F.2d 871 (6th Cir. 1974). *Cf. Heard v. Mueller, supra* at 193.

Although not conclusive,[42] the statistical evidence here was quite revealing. Inland promoted its first black foreman in 1964.[43] By 1966, the number of black supervisors had risen to four compared with four hundred and twenty-two white supervisors.[44] In 1967 there were seven black supervisors and four hundred and sixty-three white members of supervision.[45] The number of black supervisors remained constant in 1968 while the number of white supervisors dropped slightly to four hundred and fifty-five.[46] By 1969, the number of black supervisors had risen to thirteen while the ranks of white supervisors had swelled to five hundred and thirty-three.[47] In 1970, the last full year before STEAM came into effect, the number of black supervisors remained at thirteen and the number of white supervisors dropped to four hundred and seventy-six.[48] During this period black employment at Inland comprised approximately fourteen percent of the total work force.[49] During the six years between 1966 and 1971 the percentage of black foremen increased an average of one-half of one percent per year.[50] In the next two years the percentage increased from 3.53 percent to 9.14 percent or an average of 2.8 percent increase per year. It was during this latter period that the STEAM program was conceived and initiated.[51]

41. *Id.* 411 U.S. at 804–05, 93 S.Ct. at 1825, 36 L.Ed.2d at 678.

42. Other courts have held that statistics alone may be sufficient to establish a prima facie case of discrimination and shift the burden to the employer to justify its practices. *See Robinson v. City of Dallas,* 514 F.2d 1271, 1273 (5th Cir. 1975); *Morrow v. Crister,* 479 F.2d 960 (5th Cir. 1973); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971); *United States v. Hayes International Corp.,* 456 F.2d 112, 120 (5th Cir. 1972). We did not reach this question in *Heard v. Mueller, supra* at 193, but we intimated that statistics alone may be sufficient evidence to resist a motion to dismiss.

43. Defendant's brief to District Court at 31.

44. App. 132a–33a.

45. App. 134a–35a.

46. App. 136a–37a.

47. App. 138a–39a.

48. App. 106a–07a.

49. 383 F.Supp. at 223.

50. *Id.* at 224.

51. *Id.* The dramatic increase in the percentage of black supervisors after the initiation of the STEAM program is readily apparent in the statistics included in the opinion below:

| Date | Percentage |
| --- | --- |
| 1966 | 0.90 |
| 1967 | 1.50 |
| 1968 | 1.51 |
| 1969 | 2.38 |
| 1970 | 2.66 |
| 1971 | 3.53 |
| 1972 | 7.63 |
| 1973 | 9.14 |

*Id.* (Emphasis added).

■ It is apparent from a review of these statistics that there were relatively few minority employees in supervisory positions in relation to the number of white supervisors. There were also relatively few blacks at a supervisory level in comparison to the number of blacks employed at the hourly level. Although these statistics do not themselves establish a violation of Title VII, they are evidence of a disparity in promotional opportunity between Inland's black and white employees during that period. The District Court properly considered this evidence in reaching its conclusion that Appellee had discriminated against its minority employees in the selection of supervisors.

The District Court concluded that Inland's promotional system before the inception of the STEAM program had denied its minority employees equal opportunities for advancement. The court described the selection process:

Prior to September of 1971, there was no formal method of selecting supervisors. Foremen and plant supervisors would suggest candidates. Employees could apply at the Personnel Department by using a transfer form referred to in paragraph 55 of the collective bargaining agreement or by informally advising a foreman of their interest. Foremen were not required to advise Personnel of such interest. No effort was made to interest employees in general in promotion, no posting of openings was made, and no formal method of selection had been developed. 383 F.Supp. at 224

In *Rowe v. General Motors Corp.,* supra at 359, the Fifth Circuit struck down a promotional system similar to that used at Inland. The District Judge in this case adopted the language of the *Rowe* court in describing the potentiality for discrimination inherent in a system where the promotion of black employees depends on the subjective evaluations of white supervisors:

"The methods for promotion . . . would enable an individual foreman, if he were so inclined, to exercise racial discrimination in his selection of candidates for promotion . . . and that, under the social structure of the times and place, Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups. All we do today is recognize that promotion . . . procedures which depend almost entirely upon the subjective evaluation and the favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. *We and others have expressed the scepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action.*" [emphasis added].
383 F.Supp. at 227, quoting 457 F.2d at 359.

The *Rowe* Court isolated five factors which made the promotional system a "ready mechanism" for covert discrimination against minority employees:

(i) The foreman's recommendation is the indispensable single most important factor in the promotion process.

(ii) Foremen are given no written instructions pertaining to the qualifications necessary for promotion. (They are given nothing in writing telling them what to look for in making their recommendations.)

(iii) Those standards which were determined to be controlling are vague and subjective.

(iv) Hourly employees are not notified of promotion opportunities nor are they notified of the qualifications necessary to get jobs.

(v) There are no safeguards in the procedure designed to avert discriminatory practices.
457 F.2d at 358–359.

Many of these same weaknesses were endemic to the promotional procedures at Inland. Although Appellee argues that foremen at Inland did not have the power to veto promotions for people working under

them, it is apparent that the foreman's evaluation carried great weight in the selection process[52] and, in at least one case, doubts expressed by a foreman about an individual's qualifications resulted in his rejection.[53] The importance of subjective evaluation in the selection process was heightened by the apparent absence of objective criteria for evaluating potential supervisors. Also lacking was an established means for notifying hourly employees of openings in supervision and the desired qualifications.[54] The majority of promotions were arranged through the good offices of those already occupying supervisory positions.[55] There was no publicized means of applying directly for promotion out of the hourly ranks.[56]

 We have previously recognized that placing too great an emphasis on subjective evaluations in employment decisions tends to favor the incumbent class at the expense of the minority. *See Sims v. Sheet Metal Workers Int. Ass'n, Local 65, supra* at 1026: *Afro American Patrolmen's League v. Duck, supra* at 300–01.[57] As we stated in *Palmer v. General Mills, Inc., supra* at 1043, it is not enough that there are some employment opportunities available to minority employees, Title VII requires that there be *equal* employment opportunities available.[58] Given the gross disparity between

52. The testimony of Irwin W. Stines, Director of Personnel at Inland, was particularly enlightening regarding the role of management personnel in Inland's foreman selection process:
Q. During this period of time [1948 to 1969], what was the program for the selection and training of foremen at Inland Division?
A. We attempted through our supervision primarily in the plant to have them suggest to us employees who they felt would be candidates for this program. They were not necessarily the sole source, but they were the majority source, I would say. Other sources might have been people who had these folks in night school courses, and recognized otherwise by employees in our plant, members of management for whom the candidate worked. After the names were collected over a period of time, we kept a roster of them, and when we anticipated a need for additional foremen . . . [w]e would take the number of people we wanted to put in the program, and we would have them reviewed and their qualifications reviewed and placed into a resume. That was eventually submitted to what we called our Management Committee. . . . We would review the resumes, determine whether we felt the person would make an appropriate candidate, and then our decision was returned to the Personnel Division where they handled the administration of getting the man from his current work assignment into the program.
Record at 490–91.

53. Clarence Richards, one of the names offered by Appellant as a qualified black employee who was not promoted, was considered at one time for promotion to a salaried position. The promotion was withdrawn after someone in supervision said that they did not think he possessed the necessary qualifications. Record at 350–52. Appellant also testified that he became aware that he was being considered for promotion at one time but was turned down without explanation after inquiry was made to the supervisors in his department. Record at 169–70.

54. 383 F.Supp. at 224.

55. Record at 14, 155, 490, 501.

56. 383 F.Supp. at 224. Mr. Stines testified that there were two avenues open to an employee who desired promotion other than by direct recommendation of his foreman. One was to approach his foreman, the Personnel Director or the Labor Relations Department and request consideration for promotion. The other was to take advantage of a provision in the collective bargaining agreement which provided for applications for transfer. Record at 501. Under questioning by the Court, Mr. Stines admitted that the paragraph was inserted in the agreement to facilitate transfer between departments within the collective bargaining unit and not specifically for promotions out of the unit. Record at 506–10.

57. Other courts have found that selection procedures too heavily dependent on subjective evaluations violate Title VII. *See e. g., Baxter v. Savannah Sugar Refining Corp., supra* at 441 n. 3; *Petteway v. American Cast Iron Pipe Co., supra* at 241; *United States v. N. L. Industries,* 479 F.2d 354, 368 (8th Cir. 1973); *Brown v. Gaston County Dyeing Machine Co., supra* at 1382–83; *Rowe v. General Motors Corp., supra* at 359; *United States v. Jacksonville Terminal Co., supra* at 453; *Parham v. Southwestern Bell Telephone Co., supra* at 424, 427.

58. Appellee argues that Appellant has failed to show that members of the class had applied for promotion to supervisor and had been rejected on account of their race. The fact that members of the class had not applied for supervi-

the number of blacks and whites in supervisory positions, and the equally gross disparity between the percentages of blacks employed at the hourly and supervisory levels, we cannot say that it was clear error for the district court to conclude that such disparities were the result of Inland's subjective selection process. Nor was it error for the court to shift the burden to Appellee after a prima facie case of discrimination had been made to explain why so few blacks had been promoted during this period, particularly in light of the dramatic successes of the STEAM program shortly thereafter. Once a prima facie case of employment discrimination has been made, a strong presumption arises that individual members of the class would have received promotions if the system had been based entirely on merit. *See Baxter v. Savannah Sugar Refining Corp., supra* at 443. Appellee has not overcome this presumption.

■ Appellee further seeks to limit the period for which back pay may be awarded by raising the issue of the statute of limitations to be applied. This issue, however, is not properly before the Court. The statute of limitations is an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure and must be expressly raised or else it is waived. *See Moore* ¶ 8.27[3] at 1853. Appellee raised this defense for the first time in a motion to amend its answer filed after the district court had rendered its opinion. In light of our recent decision in *United States v. Masonry Cont. Ass'n, Inc., supra* at 877, we cannot say that the

District Court's denial of the motion was an abuse of discretion.

Affirmed.

sion is not dispositive of the question whether they had equal promotional opportunities. As we noted in *Palmer v. General Mills, Inc., supra* at 1043:

> That the plaintiffs have not sought promotions and transfers and that they could have made considerable progress had they done so, are not facts relevant to the present inquiry. At best, such findings indicate only that the plaintiffs have certain employment opportunities available to them at the plant. Yet for Title VII purposes the crucial question is whether the women have *equal* opportunities available to them. [Emphasis in the original]

Among the weaknesses that the District Court found existed in Inland's former promotional system was that there was no formal method of applying for promotion to supervisor, there was no effort made to interest employees in promotions in general, and openings were not posted. 383 F.Supp. at 224, 226. Most promotions were not employee initiated but were begun by individuals higher up in the organization. Record at 36, 155, 490. There was also evidence that individuals were often unaware that they were even being considered for promotion. Record at 169–70, 350–52. Given the unstructured nature of the promotional procedures at Inland, it would be unfair to require that minority employees exhaust all possible avenues of advancement in order to demonstrate that they have been denied an equal opportunity for promotion.