Darlene THOMPSON et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the
ROMEO COMMUNITY SCHOOLS
et al., Defendants.

No. G75–557 C.A.

United States District Court,
W. D. Michigan, S. D.

May 27, 1976.

Beer & Boltz, by Warren J. Bennia and Russ E. Boltz, Bloomfield Hills, Mich., for plaintiffs.

Butzel, Long, Gust, Klein & Van Zile, by William Saxton, Robert M. Vercruysse and Virginia F. Metz, Detroit, Mich., Cholette, Perkins & Buchanan, by Robert A. Benson, Grand Rapids, Mich., and Thomas & Delaney, by Joseph H. Delaney, Flint, Mich., for defendants.

## OPINION

FOX, Chief Judge.

This action challenges the sick/disability leave provisions of various school districts in the State of Michigan, insofar as those provisions treat pregnancy in a different manner from any other temporary disability. Plaintiffs seek to sue under the Fourteenth Amendment to the Constitution of the United States as well as 42 U.S.C. §§ 1983, 2000e et seq., and 20 U.S.C. § 1681 et seq. Plaintiffs include certain named female teachers employed by various boards of education throughout the state. These individuals began this suit for themselves and on behalf of all others similarly situated. Additional plaintiffs are the Michigan Education Association (MEA) and the Warren Education Association (WEA), each acting for itself and on behalf of its members "similarly situated." Eight school boards are named as defendants, for themselves and all other boards of education similarly situated. In addition, the complaint names

individual board members and certain officers and employees of these named boards on behalf of themselves and all other officers, members, and employees of all other Michigan school district boards of education similarly situated. Finally, the Michigan Association of School Boards (MASB) is also named as a defendant, for itself and on behalf of its members.

A considerable number of motions have been made and argued. A lengthy hearing has been conducted which mostly concerned the matter of certification of the case as a class action, although some of the evidence presented may also be relevant to certain other motions. This opinion is addressed mainly to the class action issues. However, during the course of resolving those issues, certain other motions are discussed and decided. Finally, some jurisdictional matters will also be considered, while decisions on some of the pending motions are deferred.

## I.

## CLASS ACTION

*A.*

The class action issues will be considered solely in the context of the claims which have been made under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. That is the true thrust of the suit, even though plaintiffs allege other grounds for relief. Tr. Vol. I at 25. If relief is granted under Title VII, the named individual plaintiffs will be made whole and resolution of the other claims will be unnec-

essary for them. On the other hand, there *may* be some persons who are not entitled to full relief under Title VII and who will therefore have to rely on the other claims.[1]

■ Plaintiffs have themselves suggested that the factual issues in their § 1983 claim may be quite extensive, if they hope to avoid the impact of *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). Tr. Vol. I at 101–102. Indeed, it may be that extensive factual background will be necessary for each named plaintiff as well as each school district. As for using Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 in a challenge to employment practices, there appear to be few cases to guide this court, if and when the court reaches the merits. I am reluctant in such a situation to certify a class when there are, at this time, no named members of the class who will need to rely on Title IX. Therefore, in view of the complexity of the issues under Title IX and § 1983, and in the exercise of the court's sound discretion, I decline, at this time, to certify a class action on matters other than the Title VII issues. However, should it appear, as the case progresses, that there do in fact exist a sufficient number of identifiable women who, in order to acquire complete relief, will have to rely on a cause of action under Title IX, a class may yet be certified to determine their right to relief.

*B.*

■ It is apparent from all the evidence[2] which has been presented during these pro-

---

1. If a class is not certified as to these latter two issues and named individual plaintiffs are afforded complete relief under Title VII, the remaining matters would be moot as to them and they could not act as class representatives. If the case is certified as a whole as a class action, the mootness as to named plaintiffs would not end the need for determination of the other claims, if there are other members of the class whose claims are not mooted. Before the MEA or WEA can act on behalf such individuals, it must be shown such persons exist.

2. Evidence has been received, during these hearings, which might otherwise be inadmissible under the Federal Rules of Evidence. Rule 1101(b) of those Rules provides that they "apply generally to civil actions and proceedings."

However, the Rules need not be viewed as binding during a hearing on such preliminary matters as class certification when a full scale evidentiary hearing may not be absolutely necessary.

At the time the Supreme Court issued its opinion in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), it had already prescribed its form of the Rules of Evidence, which were eventually to become effective, as modified by Congress. In *Eisen*, the Court said that a class action hearing "of necessity . . . is not accompanied by the traditional rules and procedures applicable to civil trials." Id. at 178, 94 S.Ct. at 2153. Such a view of the Rules is consistent with Rule 102's mandate to construe the Rules in a man-

ceedings that, as I have repeatedly said, there is a single cardinal issue in the Title VII aspect of this case: Whether a school board, which refuses to allow pregnancy-related disabilities to be treated as are all other temporary disabilities, is illegally discriminating on the basis of sex, within the meaning of Title VII. The Sixth Circuit has resolved the legal issue [3] and the factual question reduces down basically to whether female teachers are allowed full use of paid sick leave in connection with pregnancy and childbirth related disabilities. Defendants have repeatedly acknowledged that this common question of law exists. Nevertheless, they contend that the action should not be maintained as a class action, at least not a defendant's class.

■ Rule 23 of the Federal Rules of Civil Procedure provides that all the requirements of 23(a) must be met as well as one of the subsections in 23(b) in order for an action to be maintained as a class action. The first requirement is numerosity. I find that as to both a plaintiff's class and a defendant's class, this requirement is met. I have considered the proposed defendant's class to be all school boards in the State of Michigan which, since March 24, 1972, have treated or now treat pregnancy related disability differently than other temporary disabilities, limited to the school boards in districts wherein the Michigan Education Association has female members who have been or will be subject to such policies.[4] Similarly, the plaintiff's class includes all female teachers in such districts who have been since March 24, 1972, or will be in the future denied the benefits of a non-discriminatory sick leave policy.[5] Both classes are "so numerous that joinder of all members is impracticable." See *Barnes v. Board of Trustees, Michigan Veterans Trust Fund,* 369 F.Supp. 1327, 1333 (W.D.Mich.1973).

The requirement of common questions of law or fact has been conceded and so I find that such common questions exist.

## C.

The remaining two criteria of 23(a) are interrelated and raise the most serious questions of this case. The claims of the representatives must be typical of those of the class and the representatives must fairly and adequately protect the interests of the class. As the Sixth Circuit has recently

---

ner so as to avoid unjustifiable expense and delay without negatively affecting the just determination of the merits of the case. Cf. Rule 1 of Fed.Rules of Civ.P.

The documentary evidence which was received during plaintiffs' presentation has not been challenged as inaccurate—only that certain foundational requirements were not met. Such objections may have merit in a trial on the merits, but in a preliminary matter, where the hearings extended over a period of almost a month so that there was adequate time to check the accuracy of the exhibits, the objections are insufficient.

3. *Satty v. Nashville Gas Co.,* 522 F.2d 850 (6th Cir. 1975); *Farkas v. Southwestern City School District,* 506 F.2d 1400 (6th Cir. 1974) (table). Of course the question at this stage is not whether plaintiffs have a meritorious case, but is instead whether the requirements of Rule 23 are met. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Nevertheless, these Sixth Circuit decisions provide a perspective from which to view certain class action questions. These rulings on the law plainly narrow the necessary factual inquiries and thus make class actions more appropriate.

4. Plaintiffs have also requested that the class include all members of such boards and all administrative personnel responsible for implementing the alleged discriminatory policies of such boards. For purpose of the Title VII claims, I decline to include such persons in the class. Any injunctive relief against the boards will also bind the boards' members and agents. Aside from superintendents, the administrators who implement the policies appear to occupy different positions in different districts. Unless particular actions by particular administrators have resulted in discrimination, they are not necessary to resolution of the single cardinal issue.

5. When considering back pay, there may be a need to consider subclasses, where such factors as Title VII's statute of limitations may have an impact. In connection with the statute of limitations see *Guy v. Robbins & Myers, Inc.,* 525 F.2d 124 (6th Cir. 1975), cert. granted, —— U.S. ——, 96 S.Ct. 1723, 48 L.Ed.2d 193, 44 U.S. L.W. 3608 (1976); *Burwell v. Eastern Airlines, Inc.,* 68 F.R.D. 495, 498–499 (E.D.Va.1975).

indicated in *Senter v. General Motors Corp.*, 532 F.2d 511 (1976), a discussion of these two prerequisites may also involve a discussion of standing.

■ The named individual plaintiffs clearly have standing to represent separate classes against the named school boards. Their claims are typical and it appears at this time that they will vigorously prosecute the case through qualified counsel. See *Senter*, supra, at 524. Insofar as *Lynch v. Sperry Rand Corp.*, 62 F.R.D. 78 (S.D.N.Y.1973), can be read to disapprove of the same counsel acting for the individual plaintiffs and the two education associations, I disagree with *Lynch*. As stated below, I find no insurmountable conflict in this case. See note 11, infra.

The real problems which must be faced concern the defendant's class, the plaintiff's class insofar as it involves teachers not employed by named defendants, and the role of the MEA and WEA as class representatives. Because I view the MEA's presence as being a significant aid in resolving the other issues, I will first address its standing as a class representative.[6]

### D. Standing of Education Associations.

■ Before the MEA's status as a class representative can be examined, it must first have standing to sue at all. I am unpersuaded by defendants' contention that the MEA must show injury to itself as distinguished from injury to its members. Although defendants have cited authority from other circuits to support their view, in the Sixth Circuit, the test is whether there is injury either to members of the organization or to the organization directly. *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308 (6th Cir. 1975). See *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Any contention that the standards set out in *Sierra Club v. Morton* are inapplicable to civil rights cases must be rejected. See *Meek v. Pittenger*, 421 U.S. 349, 355–

356 n.5, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

In the recent case of *Memphis American Federation of Teachers, Local 2032 v. Board of Education of Memphis City Schools*, 534 F.2d 699 (1976), the Sixth Circuit considered the question of whether a teachers' union has standing to sue under 42 U.S.C. § 1983 and said:

"This action was brought by MAFT as an entity and by two members of MAFT in their individual capacities and as members of a class. The issue of whether MAFT has standing as a named plaintiff to sue under 42 U.S.C. § 1983 for the abridgement of the constitutional rights of its members, was one which troubled the District Court. We conclude that unions, as entities, are entitled to sue under § 1983 as 'persons' to protect rights secured by the Constitution and laws of the United States. *Allee v. Medrano*, 416 U.S. 802, 819 n.13, 94 S.Ct. 2191, 2202, 40 L.Ed.2d 566, 582 (1974).

"Since a union can act only through its members, actions by state or local officials which allegedly deny the constitutional rights of its members impede equally the rights of the union." At 702 [footnote deleted].

Furthermore, it is significant that EEOC regulations specifically recognize the appropriateness of allowing an organization to act on behalf of a victim of discrimination. See 29 CFR § 1601.6 (1975). In fact both the MEA and the WEA did file charges with the EEOC on behalf of several of the named plaintiffs and the "right to sue" letters in those instances were sent to the organizations. The policies of the controlling administrative agency, as evidenced by regulations such as § 1601.6, are entitled to considerable weight when a court is considering judicially created, as opposed to constitutionally compelled, restraints on its jurisdiction. In such an area of federal

---

**6.** The presence of individual teachers and the two education associations in this case has had a significant impact upon my ultimate definitions of the classes. Plaintiff's class has been defined to be broader in some ways and narrower in others, than it might be if the class representatives included only the associations or only the teachers.

common law, the policies and purposes of related statutes and regulations must be considered. See *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). I can find nothing which calls for denying standing in the MEA.[7]

### E. Education Associations as Class Representatives.

The MEA also has standing to act as a class representative. While it is frequently stated that, to be a class representative, one must be a member of the class, *Senter*, supra, 532 F.2d at 517, 524; *Schlesinger v. Reservists Committee Against the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Bailey v. Patterson*, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962), the statement clearly applies only to individuals as class representatives. It is hardly novel that an organization's standing as a class representative should depend not on *its* membership in the class, but instead on whether its members, who give it standing to sue at all, are also members of the plaintiff class. *Smith v. Board of Education of Morrilton School, School District, No. 32*, 365 F.2d 770 (8th Cir. 1966); *Arkansas Education Ass'n v. Board of Education of Portland, Ark.*, 446 F.2d 763 (8th Cir. 1971).[8] When viewed in that light, the MEA and WEA clearly have standing to act as class representatives. In fact, the MEA is a most appropriate class representative in that it has standing against each member of the defendant class, because of the manner in which I have defined that class.

Defendants have argued that internal conflicts within the MEA and within the WEA prevent either from adequately protecting the interests of the class. They have elicited testimony indicating that some members of the education associations would prefer not to have the associations financing this litigation. Defendants contend that male members of the association and female members who will not become pregnant have interests in opposition to the interests of the proposed class. No substantial direct conflict appears to exist.

No persuasive evidence has been presented that a change in the pregnancy-sick leave policies will increase the ordinary school board's obligations nor substantially increase its actual costs. Thus, such changes have not been shown to have a substantial impact on members of the association who are not in the plaintiff's class. On the other hand, evidence is unnecessary to support the contention that certain administrative costs will be incurred if back pay is awarded and thus those funds will be unavailable to benefit the associations' total memberships. Likewise, money spent by the associations on this litigation will be unavailable for the total memberships.

I conclude that the potential conflicts to which defendants allude are not sufficient to prevent the education associations from being proper class representatives. The same general possibilities for conflict were present in the Eighth Circuit cases previously mentioned. Although the opinions did not specifically address the issue of internal conflicts, they must have implicitly resolved those matters in favor of the associations in order to allow the associations to act as class representatives.

Defendants have provided the court with several cases which are believed to support their contentions that the education associations may not properly be parties nor be class representatives. *Cook County College Teachers Union Local 1600 v. Byrd*, 456 F.2d 882 (7th Cir.), cert. denied, 409 U.S. 848, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972);

---

**7.** Likewise the Warren Education Association has standing. Even cases denying unions the ability to act as class representatives generally find sufficient standing for the unions to be parties to the action. See, e. g., *Air Line Stewards and Stewardesses Assoc. Local 550 v. American Airlines, Inc.*, 490 F.2d 636, 642 (7th Cir. 1973), cert. denied sub nom. *Air Line Stew-*

*ards and Stewardesses Assoc. Local 550 v. Zipes*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 773 (1974).

**8.** In *MAFT v. Board of Education of Memphis City Schools*, supra, the union did not seek to act as class representative although the action was maintained as a class action.

*EEOC v. American Tel. & Tel.*, 506 F.2d 735 (3rd Cir. 1974); *Air Line Stewards and Stewardesses Assoc. Local 550 v. American Airlines, Inc.*, supra; *Lynch v. Sperry Rand Corp.*, supra. As an initial matter, it should be noted that the latter two cases both specifically recognize that unions may be proper plaintiffs in this type of action even if unions may not properly be class representatives.

In *Cook County College Teachers*, supra, the Seventh Circuit held that the union did not have standing to be a party at all in the case, since the union alleged merely that the case was of general interest to all faculty members. The Court felt that such interest was no different than the interest of the general public. The Court did not discuss the union's standing to protect any more particularized interest of its members. Viewed in that perspective, the case simply stands for the proposition that the union had not shown that it had a sufficient personal stake in the controversy to acquire standing. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). To the extent that the court's dictum would support a result inconsistent with the Eighth Circuit's decisions, I follow the latter.[9]

The Third Circuit's decision in the A.T. & T. case concerned a settled action. The union sought to intervene and oppose the settlement that the EEOC had reached with the defendants. Although the union sought to represent the class of its members, the Court denied it such status. While there certainly is language that supports the defendants' contentions in our case, it is significant that as to the only aspects of the case properly before the Court of Appeals, the union was in fact defending its collective bargaining agreement and all of its conduct in that regard indicated that it was truly a defendant and not a proper representative for plaintiffs. Thus, the result in

that case would not be inconsistent with a decision in our case which would allow the unions to *attack* policies which may be found in collective bargaining agreements. In fact, the District Court in the A.T. & T. case specifically allowed the union to intervene as to matters on which the union had previously filed charges with the EEOC—maternity benefits. The Court of Appeals did not have jurisdiction over that aspect of the case and its opinion does not purport to hold that such intervention was improper.

In the *American Airlines* case, the Seventh Circuit also dealt with a settlement of a class suit. It was at that stage of the case that several members of the plaintiff's class objected. The Court of Appeals found that, as to matters of back pay and seniority, which were the only active issues in the case, the union representing presently employed airline stewardesses had interests antagonistic to members of the class who had been discharged and sought full reinstatement and back pay.

Three particulars of the case should be noted. First, the Court dealt not with potential conflicts, but with a situation where *the union had admittedly, during settlement negotiations, protected the interests of non-members of the class against the interests of members of the class.* The union attempted to justify its action by referring to its status as collective bargaining representative, but the Court rejected the argument. Second, the Court neither discussed nor recognized any potential conflicts between male and female members of the union. Third, as mentioned before, the Court held (contrary to defendants' contention in our case) that the union may properly be a plaintiff in a Title VII suit to protect the rights of its members, but that it simply could not compromise those rights.

I do not view the language in *American Airlines* that dealt with actual conflicts in the settlement process to be inconsistent

---

**9.** Defendants contend that the Sixth Circuit's citation of *College Teachers in Senter v. General Motors Corp.*, supra, 532 F.2d at 522, indicated the Sixth Circuit's approval of the reasoning in *College Teachers*. The contention is without merit since the Sixth Circuit cited the case only for the proposition that the burden is upon the party seeking to utilize the class action device to establish his right to do so. No comments, favorable or unfavorable, were made with respect to the result in *College Teachers*.

with my decision to allow the MEA and WEA to begin this case as class representatives. I agree that status as a collective bargaining unit does not give a union the right to compromise the statutory rights of its members. However, I find no indication that the MEA will not forcefully press this class suit to its conclusion as strongly as would any individual plaintiff. No past action of the MEA has been shown which would be inconsistent with that finding.

Similarly, the WEA has sufficiently shown its commitment to this action. Evidence that an education association has compromised at the collective bargaining table is not persuasive as to whether it will in fact compromise a suit to enforce the statutory or constitutional rights of its members. While it is true that the WEA has signed at least one collective bargaining agreement subject to attack in this case, I do not view such conduct as reflecting a position inconsistent with the goals of plaintiffs in this lawsuit. Indeed the evidence more accurately indicates that the WEA merely sought to avoid the necessity for engaging in this litigation by resolving the matter pursuant to collective bargaining. That it failed to succeed in this endeavor does not mean that it is any less committed to the realization of the statutory rights of its female members.

Such a conclusion is particularly appropriate where, as here, the education association can neither strike to support its demands nor compel an employer to submit to binding arbitration.[10] The defendants have argued that the WEA could have negotiated a contract which would not have violated Title VII, if it had been willing to give up other benefits. That is not relevant. If the Warren master contract, as it exists, does violate Title VII, the education association need not agree to give up any benefits as a

condition precedent to having the sick leave provisions of the collective bargaining agreement changed to include pregnancy related disabilities. While the school district may have to skillfully negotiate other aspects of the collective bargaining agreement, if it views the statute as imposing increased costs, the school board cannot condition a statutorily mandated change upon the association's agreement to other nonmandated provisions.

In *Lynch v. Sperry Rand Corp.*, supra, the Court was not dealing with a settlement situation. The District Court relied solely upon potential conflicts of interest to deny the unions' status as class representatives and to prohibit the individual plaintiffs from employing the same counsel as did the unions. *Lynch* could be distinguished in that counterclaims were made against the unions and as of yet no counterclaims have been filed in our case. That however is not a controlling distinction.

More to the point, I simply am not persuaded that *Lynch* was correctly decided. The court gave no weight to the EEOC's recognition that organizations including unions may represent victims of discrimination before the EEOC. As stated before, I think this is a factor entitled to significant weight. When the EEOC's position is added to a policy of liberality in civil rights class actions, I must disagree with a conclusion that mere amorphous potential conflicts, raised only by defendants and not by members of the proposed plaintiff's class itself, preclude class representation where the court is otherwise convinced of the representatives' commitment to adequately protect the interests of the class.[11] *Communications Workers of America v. New York Tel. Co.*, 8 EPD ¶ 9542 (S.D.N.Y.1974), also cited by defendants, adds nothing to the *Lynch* case.

---

**10.** A recent opinion of the Michigan Attorney General indicates that a board of education cannot commit itself to binding arbitration on economic issues. Opinion No. 4946 (Feb. 20, 1976).

**11.** Even if the associations could not themselves act as class representatives, it does not follow that individual teachers would have to

seek out additional attorneys. The District Court in *Lynch* cited no authority for such a result. Indeed since the unions were allowed to remain as plaintiffs in *Lynch* because they were entitled to seek to have discrimination eliminated, it would seem the better course to await emergence of actual conflicts.

*F. MASB.*

I also tentatively conclude that MASB should be designated a class representative. MASB's standing is similar to that of the MEA. Each acquires standing because of the standing of each's members. MASB would certainly have standing to sue on behalf of its members. Of course that does not compel the conclusion that MASB may be sued on behalf of its members. However, there is also substantial evidence to support MASB's status as a defendant in this action independent of its standing as an association.[12] But see infra, Part III C. Subject to future reconsideration, I hold that MASB is a proper class representative for that portion of the defendant class which includes members of MASB. While I do not deem it crucial that MASB be designated as a class representative, in order for this case to continue as a defendant's class action, MASB and its counterpart, the MEA, will provide useful vehicles for getting notice of this action to members of the respective classes.

*G. Scope of Classes—"Standing" as to Unnamed School Boards.*

The problem of the scope of the plaintiff's class and defendant's class is also best seen as one of "standing" in some sense of the word.[13] Defendants point to *LaMar v. H. & B. Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), and several district court opinions of the same genre. In *LaMar*, the Ninth Circuit Court of Appeals was faced with damage suits in a commercial setting, in which a plaintiff having a cause of action against a single defendant sought to institute a class action against that defendant and additional defendants against whom the named plaintiff had no personal claim. This situation can arise either when a plaintiff seeks to have a defendant's class certified or in a simple case of joining several defendants. In either event, the Ninth Circuit held that a plaintiff "cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands he suffered no injury." 489 F.2d at 462. This is the case even though all the defendants have engaged in conduct closely similar to that of the single defendant.

The Court of Appeals based its conclusions upon interpretations of Rule 23(a)(2) and (3), rather than standing *per se*.[14] Nevertheless, the crux of the decision was that the exercise of judicial power is generally inappropriate in a case where the named plaintiffs do not have a cause of action against each defendant. The Court did leave open several exceptions to its rather strict rule: (i) cases of properly alleged conspiracies, and (ii) cases wherein the defendants are *"juridically related"* and hence justifying a single resolution to the whole matter. In addition, the Court acknowledged that Rule 23 may be more

---

**12.** The court has been intrigued by just what role the MASB performs in Michigan's educational scheme. From Def. Ex. 29 (an advertising brochure for MASB), it would appear that the functions of MASB track the constitutional role of the Michigan State Board of Education, as explained by the members of Michigan Constitutional Convention of 1961–62 in their statement to the people of Michigan—*"What the Proposed New State Constitution Means to You."* See appendix.

**13.** As used in this part of the opinion, "standing" is a symbol for the requirements of 23(a)(2) and (3) as well as a term having its own independent meaning.

Except for these matters of "standing," a defendant's class is clearly appropriate. The adequacy of defense counsel in this case cannot be disputed. While the named boards of educa-

tion have attempted to protest their unwillingness to act on behalf of the class, I conclude that since the principal issue is the same for all defendants, a vigorous defense for one is a vigorous defense for all. "Desire," as opposed to ability, has only token weight at most. *Research Corp. v. Pfister Assoc. Growers, Inc.*, 301 F.Supp. 497, 499 (N.D.Ill.1969), appeal dismissed on other grounds sub nom. *Research Corp. v. Asgrow Seed Co.*, 425 F.2d 1059 (7th Cir. 1970). Because the issues are the same, named defendants will not incur any substantial increase in the expense of defending the class. They need not bear the costs of determining individual matters of back pay.

**14.** Compare *Weiner v. Bank of King of Prussia*, 358 F.Supp. 684 (E.D.Pa.1973), in which the Court spoke in terms of Constitutional standing.

broadly construed in civil rights cases.[15] Other decisions supporting or following *LaMar* include *Leonard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 64 F.R.D. 432 (S.D.N.Y.1974), *Chevalier v. Baird Savings Assoc.*, 66 F.R.D. 105 (E.D.Pa.1975), and *Mudd v. Busse*, 68 F.R.D. 522 (N.D.Ind. 1975).

Even some cases dealing with claims under 42 U.S.C. § 1983 support *LaMar* and defendants' contentions. In *Wilson v. Kelley*, 294 F.Supp. 1005 (N.D.Ga.), aff'd per curiam, 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968), one of the plaintiffs' claims dealt with discriminatory hiring practices by sheriffs and wardens of state prisons and local jails. While the District Court held that plaintiffs (prisoners) had no standing to contest hiring practices, it also added dicta concerning whether plaintiff's and defendant's classes would be appropriate. Because the members of the proposed defendant class were separate employers with varying hiring practices, "[a] suit against one could no more bind them all than an employment claim against one automobile dealer, one bakery, or one business of any type could bind all the other like businesses within the state." 294 F.Supp. at 1010.

There is a significant distinguishing aspect to the *Wilson* case which would allow for a different result in the instant action. In *Wilson*, the discrimination as to each defendant did not involve *per se* discriminatory practices. That is, proof as to the totality of hiring circumstances would be required. The matter may have been treated differently if the defendants all had openly expressed policies of not hiring blacks.

That different results can occur from these different situations is made apparent in two decisions by Judge Merhige in the Eastern District of Virginia. *Taliaferro v. State Council of Higher Education*, 372 F.Supp. 1378 (1974); *Paxman v. Wilkerson*, 390 F.Supp. 442 (1975). In *Taliaferro*, the allegations were of unconstitutional sex discrimination, in general, being practiced by Virginia's institutions of higher learning. Because of his concern about a class including separate institutions with whom named plaintiffs had no contact, Judge Merhige tentatively limited the plaintiff's class to those alleging violations by the named defendants. He did, however, leave open the possibility of including more defendants if discovery indicated a wider conspiracy.

On the other hand, in the *Paxman* case, also brought under 42 U.S.C. § 1983, more specific policies were challenged—maternity leaves which set fixed times for leaving and returning.[16] In this context, the District Court, without mentioning *Taliaferro*, found no obstacle to maintaining the case both as a plaintiff's class and a defendant's class.[17] While the Court did not detail its analysis of the situation, it is apparent from the opinion that it had been presented with much the same arguments as were presented in *Taliaferro* and in the instant case. Nevertheless, the Court concluded that the requirements of 23(a) had been met and that the action also properly fell within the scope of 23(b)(2).

The significant distinction between *Taliaferro* and *Paxman* is that in the latter the common question of law was narrower and more predominant.[18] Although the particu-

---

**15.** The Sixth Circuit endorses "a broad view of standing in Title VII actions." *Senter, supra,* 532 F.2d at 517. "Standing for purposes of the Civil Rights Act of 1964 was intended by Congress to be defined as broadly as permitted by Article III of the Constitution." *Id.* If plaintiff presents "a genuine case or controversy in the Article III sense, then he should have standing to sue in his own right and as a class representative." *Id.,* quoting from *Hackett v. McGuire Bros., Inc.,* 445 F.2d 442, 447 (3rd Cir. 1971).

**16.** Also challenged in *Paxman* were policies preventing use of disability leaves for pregnan-

cy. However this aspect of the case is not discussed in the opinion in any depth.

**17.** Plaintiff's class included all pregnant teachers in Virginia, while the defendant's class was made up of members of all the school boards which maintained the discriminatory maternity leave policy.

**18.** *Mudd v. Busse, supra,* is similar to the *Taliaferro* and *Wilson v. Kelley* situations. In *Mudd,* pretrial detainees challenged the various abuses of discretion by separate members of

lars of any two school's policies may have differed, that which made them illegal was the same. Our case is thus within *Paxman* rather than *Taliaferro*. It is the exclusion of pregnancy from the category of paid-for disabilities which makes common issues of fact and law and ripens this class action. Differences in the manner, method, procedure, or personnel of negotiators or in the multiple plans, not related to this exclusion of pregnancy, are not controlling and are irrelevant. Indeed, they are dilatory and costly red herrings.

To the extent that the reasoning of *Samuel v. Univ. of Pittsburgh*, 56 F.R.D. 435 (W.D.Pa.1972) would call for a different result in *Paxman*, I agree with *Paxman*. In *Samuel*, the Court certified a defendant's class of state universities and colleges in Pennsylvania, where the schools applied a specific state rule concerning married women's residency, even though named plaintiffs were not injured by each such defendant. However, the court also held that plaintiffs lacked standing to attack the "common law rule" as applied by other members of the defendant class. If, as it appeared to be, the common law rule was essentially the same as the specific residency rule promulgated by Pennsylvania's Auditor General, then under *Paxman's* logic, a plaintiff's class would still have been appropriate. The court, however, held that since plaintiffs had not been subject to application of the common law rule, *per se*, they

the defendant's class of judicial officers setting bail as a condition for pretrial release. While the language used in the *Busse* case could be viewed as inconsistent with my decision, I am not in disagreement with the result reached in that case, where no express policy was challenged on its face.

19. The "juridically related" exception could apply to most of the cases cited in support of plaintiff's arguments in the instant case. But such a label is equally appropriate in this case. There is substantial merit to the proposition that when multiple school districts, in a statewide system of education, establish programs for paid disability leave which exclude pregnancy, by individual negotiation with employee bargaining representatives, by policy or by regular practice, they create a *juridically* related problem appropriately *justiciable in a class action.*

had no personal standing and could not maintain an action against defendants using such rule.

In addition to *Paxman*, cases which would lend support to plaintiffs' contentions include *Washington v. Lee*, 263 F.Supp. 327 (M.D.Ala.1966), aff'd 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (class of sheriffs and wardens proper in suit attacking statute calling for segregation of prisoners); *Danforth v. Christian*, 351 F.Supp. 287 (W.D.Mo.1972) (defendant class of officers charged with enforcement of Missouri's durational residency qualification for voting); *Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, 343 F.Supp. 279 (E.D.Pa. 1972) (defendant class of all Pennsylvania school districts); and *Gibbs v. Titelman*, 369 F.Supp. 38 (E.D.Pa.1973), rev'd on other grounds, 502 F.2d 1107 (3rd Cir.), cert. denied, 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974). See also *Kendall v. True*, 391 F.Supp. 413 (W.D.Ky.1975) (class of all circuit court judges in Jefferson County is certified but no class for all circuit judges in the state).

The *Gibbs* case is particularly significant. In *Gibbs*, plaintiffs challenged various statutes which authorized self-help repossession. Although the case dealt with statutes, the defendants certainly were not juridically related.[19] Nevertheless, the District Court certified both a plaintiff's class and a defendant's class.[20]

20. It may be noted that in this court's own case dealing with self-help repossession, only a plaintiff's class was certified, even though the complaint also was framed in terms of a defendant's class. See *Watson v. Branch Co. Bank*, 380 F.Supp. 945 (W.D.Mich.1974), rev'd on other grounds, 516 F.2d 902 (6th Cir. 1975). In *Watson*, however, the court had no reason to believe that institutions which came within the potential defendant's class would ignore the court's ruling. Cf. *Craft v. Memphis Light, Gas and Water Division*, 534 F.2d 684 (6th Cir. 1976), and *Kendall v. True*, supra. On the other hand, in the present case, the Sixth Circuit has already spoken to the exact issues raised in this case and yet defendants assert they need not comply until the Supreme Court has given "definitive guidelines." Tr. Vol. I at

As indicated by the above discussion, I would apply the *Paxman* rule in this case and therefore find the WEA and individual plaintiffs, as well as the MEA, to be proper representatives for the plaintiff's class. The issue has not been ruled on by the Sixth Circuit Court of Appeals. Because of the potential problems in this area, I will, as an exercise of sound discretion, limit the classes in such a manner as will give more certainty to the class action resolution. Rather than a plaintiff's class of all female teachers and a defendant's class of all school boards in Michigan, I have limited the definition of the defendant's class to include only those entities which are more closely connected with the MEA. Plaintiff's class is similarly limited to female employees of such districts.

As limited, maintaining this case as a class action does not violate the principles of *LaMar*, regardless of the soundness of those principles or the interpretation of the exceptions to *LaMar*. The MEA, having female members subject to each defendant's allegedly discriminatory policy, has sufficient standing against each defendant and meets the requirements of 23(a)(2) and (3), as construed in *LaMar*. In addition, the restrictions I have imposed are not undue limitations on the classes, since substantially all of the significant evidence presented by plaintiffs pertained only to school dis-

tricts having contracts with MEA affiliates and all of the individually named plaintiffs fall within the now limited class. Of course, I do not foreclose any expansion of the classes, if appropriate additional representative parties seek to join in this case.

### H. 23(b)(2) is met.

This case clearly comes within the meaning of 23(b)(2), which provides: "The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . . In *Gibbs v. Titelman*, supra, the District Court discussed 23(b)(2)'s application to a case of a plaintiff's and defendant's class:

"The opposing parties here are the respective classes. The defendants, as a class, have acted on grounds generally applicable to the plaintiffs' class as a whole. Action or inaction is directed to a class within the meaning of Rule 23(b)(2), even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." 369 F.Supp. at 52–53.

See Advisory Committee's Note, 39 F.R.D. 102;[21] but see *Mudd v. Busse*, supra, 68 F.R.D. at 530.

---

7. Since, in terms of res judicata, the defendants are absolutely correct that they are not bound by the earlier Sixth Circuit decisions, it is apparent that only a case having res judicata effect as to them is sufficient before the court can be assured that they will comply with the requirements of Title VII, as construed by the EEOC and my superior courts.

21. With respect to 23(b)(2) the Advisory Committee stated:

*Subdivision (b)(2).* This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in

which the appropriate final relief relates exclusively or predominantly to money damages. *Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.*

Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration. See *Potts v. Flax*, 313 F.2d 284 (5th Cir. 1963); *Bailey v. Patterson*, 323 F.2d 201 (5th Cir. 1963), cert. denied, 376 U.S. 910 [84 S.Ct. 666, 11 L.Ed.2d 609] (1964); *Brunson v. Board of Trustees of School District No. 1, Clarendon Cty., S. C.*, 311 F.2d 107 (4th Cir. 1962), cert. denied, 373 U.S. 933 [83 S.Ct. 1538, 10 L.Ed.2d 690] (1963); *Green v. School Bd. of Roanoke, Va.*, 304 F.2d 118 (4th Cir. 1962); *Orleans Parish School Bd. v. Bush*, 242 F.2d 156 (5th Cir.

Aside from the "standing" issues, defendants' only contention is that the back pay claims require the class to be within 23(b)(3), if within any part of 23(b). That contention was plainly rejected in *Senter v. General Motors Corp.*, supra, 532 F.2d at 525, where the Sixth Circuit said: "Appellant's primary prayer was for injunctive relief and the additional request for back pay does not preclude certification as a 23(b)(2) class action." Ours is not the case contemplated by the Advisory Committee when it said that 23(b)(2) "does not extend to cases in which the appropriate final relief relates *exclusively* or *predominantly* to money damages." (Emphasis added.)

The issues concerning particular teachers' back pay claims will of course involve individual consideration. However, the general question of back pay relief will be subject to a general ruling under the principles announced in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Once this general decision is reached, I anticipate that the individualized situations will be worked out between the particular board and teacher or else be referred to a special master. See *United States v. Masonry Contracts Ass'n of Memphis, Inc.*, 497 F.2d 871, 876 (6th Cir. 1974); *Meadows v. Ford Motor Co.*, 510 F.2d 939 (6th Cir. 1975); *EEOC v. Detroit Edison*, supra, 515 F.2d at 315; cf. *Senter*, supra, 532 F.2d at 525 n. 33.

## II.

## JOINDER AND VENUE

Defendants have moved for severance under Rule 21 of the Federal Rules of Civil Procedure, contending there has been a misjoinder under Rule 20.[22] They further argue that if severance is granted, certain defendants must be dismissed (or the actions against them transferred) because venue would then be improper in this district under 28 U.S.C. § 1391. Finally, named defendants contend that the issue of misjoinder must be resolved before any decisions on the class action questions are made, but no authority is cited for that view.

In response, plaintiffs argue that the joinder provisions of the Federal Rules allow for substantial discretion on the part of the trial court and that joinder is proper in this case. Even if severance were required, plaintiffs contend that venue exists in this district under 42 U.S.C. § 2000e–5(f)(3). Plaintiffs have not addressed the question of whether the decision on the severance motions must precede the determination of the class action issues.

### A. Rule 20 Inapplicable.

I hold that, in the circumstances of this case, an order certifying the case as maintainable as both a plaintiff's and defendant's class action obviates an inquiry into whether Rule 20 has been met. Rule

1957), *cert. denied*, 354 U.S. 921 [77 S.Ct. 1380, 1 L.Ed.2d 1436] (1957); *Mannings v. Board of Public Inst. of Hillsborough County, Fla.*, 277 F.2d 370 (5th Cir. 1960); *Northcross v. Board of Ed. of City of Memphis*, 302 F.2d 818 (6th Cir. 1962), *cert. denied*, 370 U.S. 944 [82 S.Ct. 1586, 8 L.Ed.2d 810] (1962); *Frasier v. Board of Trustees of Univ. of N. C.*, 134 F.Supp. 589 (M.D.N.C.1955, 3-judge court), *aff'd*, 350 U.S. 979 [76 S.Ct. 467, 100 L.Ed. 848] (1956). Subdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential. So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition. (Emphasis added.)

22. Defendants seek severance as to each individual plaintiff as well as to each set of defendants, by school district.

20 simply does not apply to the situation of members of a class, in an action brought pursuant to Rule 23. Named plaintiffs are present as representatives of a class, as are the named defendant school boards and MASB. Plaintiffs could have named just one school board and one plaintiff as class representatives. I note that the arguments which defendants have raised concerning joinder are essentially the same as those raised in opposing certification of classes. There is no need to repeat my conclusions on those matters.

Admittedly, neither Rule 20 nor Rule 23 expressly states that Rule 23 is an exception to the requirements of Rule 20. Compare Rule 19(d). Also it is noted that some parts of Rule 23 could be read as requiring compliance with Rule 20. 23(a)(1)'s requirement that the class be "so numerous that joinder of all members if impracticable" could be seen as requiring that joinder be possible except for the impracticability caused by numerosity. On the other hand, if Rule 20 did apply to class actions, then there would be no need for Rule 23 to require "questions of law or fact common to the class" since joinder under Rule 20 requires such common questions of law or fact.

■■■ In essence, my conclusion is that Rule 20 and Rule 23 concern separate situations and each has its own requirements for each situation. In the instant case, it is enough if the requirements of Rule 23(a) and (b) are met.

Defendants have not sought to sever the defendants who are board members and administrators from their respective school boards. The claims clearly arise out of the same transaction, occurrence or series of transactions or occurrences as do the claims against the respective school boards. Indeed, insofar as the Title VII claims are involved, it is not apparent that these individuals are named for any reason other than to insure that complete injunctive re-

lief will be available. In these circumstances severance is unwarranted.[23]

### B. Venue.

Even if the above-stated conclusions as to joinder are erroneous, defendants will suffer no prejudice from a denial of severance. The only prejudice asserted was that if severance were granted, venue would not lie for most of the named defendants. That contention is without merit.

Defendants initially overlooked the venue provisions of Title VII. The relevant portion of 42 U.S.C. § 2000e–5(f)(3) provides:

> "Such an action may be brought in *any judicial district in the State* in which the unlawful employment practice is alleged to have been committed . . . ." (Emphasis added.)

■■■ Defendants now contend that Congress did not mean what it said when it added the language about "*any* judicial district in the State." (Emphasis added.) While defendants' arguments regarding the legislative history have some force, I agree with Judge Merhige's conclusion, stated in *Gilbert v. General Electric Co.*, 347 F.Supp. 1058 (E.D.Va.1972), that the legislative history equally supports giving full syntactical weight to the phrase and that certain policy considerations also support finding venue anywhere in the State of the discrimination. A broad venue provision is appropriate for class actions, for which Title VII actions are peculiarly appropriate, and broad venue provisions within any state may aid in avoiding local economic and political pressures.

Defendants have cited no cases which would contradict the *Gilbert* view. While several cases do make general statements that the venue provision allows a suit to be brought in the district where the employment practice was committed, these cases do not arise in states with more than one district. See, e. g., *Stebbins v. State Farm*

---

**23.** As stated infra, in Part VI, I have deferred decision on several issues relevant to the cause of action under 42 U.S.C. § 1983. To the extent that the claims against the board members and administrators under § 1983 could raise additional joinder questions, I also defer a decision on severance.

*Mutual Automobile Ins. Co.,* 134 U.S.App. D.C. 193, 413 F.2d 1100 (1969), cert. denied, 396 U.S. 895 (1969); *Ford v. Valmac Industries, Inc.,* 494 F.2d 330 (10th Cir. 1974) (Kansas). On the other hand, in *Dubnick v. Firestone Tire & Rubber Co.,* 355 F.Supp. 138, 140 (E.D.N.Y.1973), in a state with more than one district, the court listed as among the possible proper places for venue ". . . the State in which the unlawful employment practice is alleged to have been committed."

Since, regardless of severance, the case against each school board could remain in this district and consolidation is available under Rule 42(a), defendants are not prejudiced by a denial of severance at this time.

### III.

### TITLE VII AND EXHAUSTION

Generally speaking, in order for a Title VII suit to be commenced by or against a particular party, the plaintiff must have filed a charge with the EEOC and the defendant must have been named in such charge.[24] However, these rules are not without exceptions, and while our case, as a whole, does not precisely fit within any announced exception, I conclude that it does justify an exception insofar as the class action aspects are concerned.[25]

*A. Plaintiff's and Defendant's Classes.*

Where a plaintiff's class action is involved, each individual member of the class need not have filed charges with the EEOC. Such non-filing members are not even deemed disqualified from benefitting from back pay awards.[26] *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n.8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). This is one example of the doctrine that where the requirement of filing charges does not substantially aid the purposes of the exhaustion requirement, an exception will be found.

The purpose of the exhaustion requirement has been said to be two-fold: (1) to notify the charged party, and (2) to bring the charged party before the EEOC in order to aid the statutory goal of voluntary compliance. *EEOC v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086, 1092, 1095 (6th Cir. 1974); *Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711 (7th Cir. 1969).[27] The notification purpose is only significant as related to the purpose of achieving voluntary compliance. Lack of actual notice does not bar an action. *Thornton v. East Texas Motor Freight,* 497 F.2d 416, 424 (6th Cir. 1974). Except where voluntary compliance is a realistic alternative, sufficient notice can be achieved in the context of a lawsuit.

In addition to the *Albemarle* exception, the Sixth Circuit has recognized an exception in the case of a successor employer which has actual notice. *MacMillan Bloedel Containers, Inc.,* supra. The Court held that the "statutory mandate of informal settlement and conciliation is not served by requiring an aggrieved person to charge each new successor company." Id. at 1093. When the purposes of the exhaustion requirement will not be aided, courts will give effect to the high statutory priority of avoidance of undue delay in remedying existing and past discrimination.

A third exception which has been recognized may only be a partial one. While "[i]t has also been held that the 'right to file suit against the union' does not ripen until the

**24.** These requirements are derived from various subsections of 42 U.S.C. § 2000e–5.

**25.** As to all individual named plaintiffs, except for Andrea Deebs and Lee Ann Duggan, the exhaustion requirements have been met.

**26.** Plaintiffs Deebs and Duggan may remain as named parties since "relief should be made available to all who were so damaged and whether or not they filed charges and whether or not they joined in the suit." *Bowe v. Palmo-*

*live Co.,* 416 F.2d 711, 721 (7th Cir. 1969). In *Bowe,* the Court of Appeals reversed the district court's dismissal of intervening plaintiffs who had not exhausted their administrative remedies under Title VII.

**27.** An additional purpose, not mentioned in *MacMillan,* is to focus on the scope of the charge, but this refers to *what* the charge is and not *who* the charge involves.

union is charged before the EEOC, notwithstanding the fact that an employer is charged," *EEOC v. McLean Trucking Co.*, 525 F.2d 1007, 1011 (6th Cir. 1975), such a union may nevertheless be joined in the lawsuit "at least for the purpose of interpreting the collective bargaining agreements." Id. at 1012. It may be, however, that such joinder would not be allowed if relief is sought against the union for its own alleged violations of Title VII. See *MacMillan Bloedel*, supra, 503 F.2d at 1095; *Thornton v. East Texas Motor Freight*, supra.

Our case also calls for an exception to the otherwise condition precedent of administrative filing against each school board. Frankly, I begin my analysis with the proposition that this case should be allowed to proceed as a class action unless Title VII unequivocally commands a contrary result. Insofar as class actions are meant to provide expeditious and efficient means of resolving common issues in a single piece of litigation, it is difficult to imagine a better case for a plaintiff's and defendant's class.

The narrow common issue of law at stake is exactly the same for each school district. Even though particular contracts may differ as to some aspects of disability leave and maternity leave, all defendants openly express the view, in the contract wording or its administration, that pregnancy and childbirth related disabilities are treated differently from other temporary disabilities. This practice continues despite the pronouncements of the United States Court of Appeals for the Sixth Circuit, which is controlling in Michigan at this time.

Defendants must recognize that this is the quintessential class action. Indicative of the substantial impact that a decision in this case should have on other than named defendants is the substantial financial contribution of the MASB Legal Trust Fund. A central purpose behind a school board's contribution to the Legal Trust Fund is to aid a school board involved in a case which can affect all school boards in Michigan. I "believe that this matter should be disposed of in one proceeding 'in the interest of

uniformity and in consideration of the time, effort and expense involved in duplication.'" *McLean Trucking*, supra, 525 F.2d at 1012.

The principal purpose of the exhaustion requirement—giving the parties an opportunity to voluntarily comply with the statute—will not be advanced by requiring each school board to be charged in a complaint filed with the EEOC. As stated before, voluntary compliance has not been forthcoming even though the rule in the Sixth Circuit is clear. In these narrow circumstances, to require administrative filing would be to require an empty formalism which would do damage to another statutory priority of avoiding undue delay.

It may well be argued that if school boards, which are not named in EEOC charges, are to be made part of a defendant's class in this case, they should not be subject to back pay claims. Perhaps, it could be contended, the exhaustion exception should be somewhat in the nature of the exception recognized for unions which are joined for the purpose of interpreting collective bargaining agreements. The school boards may then be subject to injunctive orders of the court, yet avoid, for the time being, liability for back pay.

The decision in *Albemarle* is persuasive, if not controlling, in rejecting that route. Instead, a result analogous to that reached in *Albemarle's* note 8 is more appropriate. Here, as there, we deal with the effect of a Rule 23 class upon an exhaustion requirement. And here, as there, the purposes of the exhaustion requirement will not be advanced. Therefore, I see no good reason why a result which is proper for a plaintiff's class is not also proper for a defendant's class, in the narrow circumstances of the present case.

Albemarle has recently emphasized that back pay is normally an essential ingredient in achieving the "make whole" purposes of Title VII. In addition, "[i]f employers faced only the prospect of an injunctive order, they would have little incentive to shun practices of dubious legality." Id. 422 U.S. at 417, 95 S.Ct. at 2371. Such an

incentive would appear necessary in this case.

### B. Board Members and Administrators.

I do not reach the same conclusion as to exhaustion concerning individual board members and administrators. Individual members and administrators were named in EEOC charges with respect to Livonia, Troy, Port Huron, and Harbor Beach. In the *Warren* cases, the EEOC complaints included references to "administrative agents" of the Warren Consolidated Schools. The other EEOC complaints did not name individual members of the board, officers, or employees of the boards.

 It must be remembered that the previous discussion deals with an *exception* to the general rule which requires a defendant to have been charged before the EEOC. A class action may present a justification for such an exception when the purposes of the general rule are otherwise fulfilled and other statutory priorities will be advanced by such an exception. On the other hand, plaintiffs would appear to suffer no prejudice from being compelled to strictly comply with the filing requirement as regards officers, employees, and agents of a charged defendant. See *Scott v. Univ. of Delaware*, 385 F.Supp. 937 (D.Del.1974) (dismissal of defendants not charged before EEOC did not unduly prejudice plaintiff "in that he may still recover the full measure of legal and equitable relief he seeks from the University pursuant to title VII"). Therefore, I will grant the motion to dismiss the Title VII claims against those defendants who are board members and employees and who have not been individually charged before the EEOC.

### C. MASB.

MASB's position is somewhat different. Without regard to the matter of back pay, it would seem necessary to have MASB before this court if adequate and total injunctive relief is to be available against the defendant's class. In that context, if MASB agreed that it is simply an agent for the school boards, it could also be dismissed without undue prejudice. In some respects the evidence so far adduced indicates that is the case, but MASB contests such a characterization of its role. I conclude that the failure to name MASB in an EEOC complaint does not prevent it from being a proper party defendant solely for the purpose of effectuating any declaratory or injunctive relief against the defendant's class. Also, insofar as MASB is merely acting as a class representative for its members, exhaustion as to MASB itself is unnecessary.

There is some evidence MASB has aided in negotiating collective bargaining agreements which have *not* discriminated against pregnancy as a temporary disability. In view of such evidence, I cannot say at this time that it would have been a fruitless gesture to charge the MASB in a complaint before the EEOC. To the extent that MASB itself is involved in inflicting the discrimination, the aim of achieving voluntary compliance could have been advanced by fulfilling the exhaustion requirements. The fact that MASB has followed the EEOC guidelines in regards to pregnancy leave in some negotiations serves to distinguish its situation from that of the separate school boards.

### IV.

### ELEVENTH AMENDMENT

Defendants move for dismissal of all monetary claims against the school boards, on the ground that such relief is prohibited by the Eleventh Amendment to the Constitution of the United States. The motion will be treated as made on behalf of the defendant's class, as well as named defendants. The motion is without merit and will be denied.

 Defendants may have confused the judicial gloss which 42 U.S.C. § 1983 has acquired with the prohibitions of the Eleventh Amendment. Regardless of what § 1983 means, our case concerns principally a cause of action under 42 U.S.C. § 2000e. While municipalities and counties are free from suit under § 1983, such political subdivisions of the state do not "occupy the same

position as a State for purposes of the Eleventh Amendment." *Edelman v. Jordan,* 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). See also *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Griffen v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Defendant school boards fall within the same rule. Thus, assuming the Eleventh Amendment can bar a statutory action, where such statute was based on Congress' power to enforce the Fourteenth Amendment, it is a "long-established rule that while [a school board's] action is generally state action for the purposes of the Fourteenth Amendment, a [school board] is not necessarily a state defendant for purposes of the Eleventh Amendment." *Edelman v. Jordan,* supra, 415 U.S. at 667 n. 12, 94 S.Ct. at 1358.

■ The Sixth Circuit has not recognized the Eleventh Amendment as a jurisdictional bar to recovery of monetary awards against local school boards. See, e. g., *LaFleur v. Cleveland Board of Education,* 465 F.2d 1184 (6th Cir. 1972), aff'd, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Doyle v. Mt. Healthy City School District Board of Education,* 529 F.2d 524 (6th Cir. 1975) (table), cert. granted, 425 U.S. 933, 96 S.Ct. 1662, 48 L.Ed.2d 174, 44 U.S.L.W. 3592 (April 19, 1976). Although the Eleventh Amendment may not have been discussed in either case, it is a matter of jurisdiction and would have to be raised sua sponte by the Court. It would be "inappropriate for the [Court of Appeals] to assume the existence of jurisdiction and then to proceed to decide the merits of [a] case." *Memphis American Federation of Teachers, Local 2032,* supra, 534 F.2d at 701. Both *LaFleur* and *Doyle* involved claims for back pay as does our case.[28]

■ The Eleventh Amendment contentions of the named board members and administrators are also without merit. See *Scheuer v. Rhodes,* 416 U.S. 232, 237–238, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This case is even stronger than *Scheuer.* Since recovery from the school board itself is not barred by the Eleventh Amendment, a fortiori recovery against members of the board and the board's employees is not barred by the Eleventh Amendment. That also distinguishes our situation from that in *Long v. Richardson,* supra.

The motion to dismiss plaintiffs' monetary claims, by reason of the Eleventh Amendment, is denied.

## V.

### 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT

As a result of my rulings on the class action matters, only the named defendants must meet the charges under 42 U.S.C. § 1983 and the Fourteenth Amendment. As to plaintiffs' cause of action under § 1983, defendants contend that school boards are not "persons" within the meaning of that section and that individuals acting in their official capacity are also not "persons," except for the purpose of declaratory and injunctive relief.

### A. Board Members and Administrators.

■ The latter contention may again indicate defendants' confusion between the principles of the Eleventh Amendment and the judicial gloss on § 1983. If the school board members and administrators are persons within the meaning of § 1983, they are persons whether the relief sought is injunctive or monetary. *City of Kenosha v. Bru-*

---

**28.** Defendants cite *Fernandez v. Flint Board of Education,* 283 F.2d 906 (6th Cir. 1960), cert. denied, 368 U.S. 843, 82 S.Ct. 71, 7 L.Ed.2d 42 (1961), for the proposition that a "Michigan board of education was not liable for damages because it was an agency of the State of Michigan." Def. brief 20. But Fernandez did not involve the Eleventh Amendment. It was a wrongful death action and concerned only immunity under state law. I recognize that *Long v. Richardson,* 525 F.2d 74 (6th Cir. 1975) looked to state case law in determining whether there were any statutes which waived the Eleventh Amendment. But *Long v. Richardson* does not compel the court to accept state law immunity as controlling in determining Eleventh Amendment immunity.

*no,* 412 U.S. 507, 513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). The Sixth Circuit recently reaffirmed the view that school board members and administrators may be subject to suit under § 1983:

"We find that the District Court had jurisdiction in this case as the complaint states a cause of action against the Superintendent and the members of the School Board in their individual capacities. The qualified good faith immunity granted to school officials does not operate to bar federal jurisdiction. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

"The right to bring an action under § 1983 against a local official in his individual capacity was upheld in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and in *Gay Students Organization of the Univ. of N. H. v. Bonner,* 509 F.2d 652, 655 (1st Cir. 1974)." *MAFT v. Board of Education of Memphis City Schools,* supra, 534 F.2d at 702.

The board members and administrators are "persons" even though they acted only in their official capacities. That was plainly the case in *Wood v. Strickland,* supra, *MAFT v. Board of Education of Memphis City Schools,* supra, and *Shirley v. Chagrin Falls Exempted Village Schools Board of Education,* 521 F.2d 1329 (6th Cir. 1975). There would have been no need to discuss *qualified* immunity in either *Wood* or *Shirley* if the defendants were not "persons" to begin with. See also *Stebbins v. Weaver,* 396 F.Supp. 104, 107–108 (W.D.Wis.1975) (President of the University of Wisconsin System "is a 'person' for the purpose of § 1983 regardless of whether he is being sued in an individual or official capacity.").

## B. School Boards Are Not Persons.

On the other hand, in *MAFT v. Board of Education of Memphis City Schools,* supra,

the Sixth Circuit Court of Appeals held for the first time that a "Board of Education in its position as a public body corporate is not a person and therefore is not amenable under § 1983 to . . . suit." Id. 534 F.2d at 702. Even though this compels the conclusion that this court has no subject matter jurisdiction over the defendant school boards under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983, that does not prevent the court from considering the implied constitutional cause of action directly under the Fourteenth Amendment, provided there is basis for jurisdiction. See *Hanna v. Drobnick,* 514 F.2d 393 (6th Cir. 1975); *Kenosha v. Bruno,* supra, 412 U.S. at 516, 93 S.Ct. 2222 (Brennan, J., concurring); *Amen v. Dearborn,* 532 F.2d 554 (6th Cir. 1976). Ordinarily, it is the general federal question statute that is used. 28 U.S.C. § 1331.

## C. Pendent Jurisdiction.

Pendent[29] jurisdiction is also available. Such a basis for jurisdiction is not often pressed, in this type of case, at least at the appellate level, since if plaintiffs are able to maintain their actions against individual officials, the necessity for having the governmental subdivisions themselves liable does not exist. The same explanation applies to courts which have not considered pendent jurisdiction—since the practical result is the same, they do not seek out a jurisdictional basis to sustain an action against the "non-person."

In the instant action, plaintiffs have clearly sought to invoke the constitutional cause of action as well as the statutory cause of action under § 1983. This court has jurisdiction over the named school boards for purpose of the Title VII cause of action and has jurisdiction over the constitutional cause of action as a pendent claim. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[30]

**29.** I do not attempt to distinguish pendent from ancillary jurisdiction. But see *Saalfrank v. O'Daniel,* 533 F.2d 325 (6th Cir. 1976).

**30.** Although Gibbs dealt with pendent state claims, the doctrine also applies to pendent federal claims. See *Hagans v. Lavine,* 415 U.S.

528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Indeed it may be more justifiable for a federal court to exercise jurisdiction over a pendent federal claim than a pendent state claim. *Hagans v. Lavine,* supra, at 545–550, 94 S.Ct. 1372.

Because there is jurisdiction over the pendent claim, I need not decide whether jurisdiction would also exist, or be exercised, by reason of the school boards being seen as pendent parties. Cf. *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

## VI.

### DEFERRAL OF OTHER MOTIONS CONCERNING FOURTEENTH AMENDMENT, 42 U.S.C. § 1983, AND 20 U.S.C. § 1681

Defendants seek to have the Fourteenth Amendment and § 1983 claims dismissed on the authority of *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). In addition, defendants claim that monetary relief against the individual officials cannot be granted because plaintiffs' sole claim against these officials is pursuant to the doctrine of respondeat superior and that doctrine does not apply to § 1983 claims. Finally, defendants contend that 20 U.S.C. § 1681 et seq. does not authorize suits by private parties. As to these matters, determination will be deferred pursuant to Rule 12(d) of the Federal Rules of Civil Procedure. Because of plaintiffs' claims under Title VII, it may be unnecessary to decide these issues.

## VII.

### SUMMARY OF RULINGS

1. This case is certified as both a plaintiff's and defendant's class action only as to the claims under Title VII, with the named parties acting as class representatives for the following classes:

*Defendant class:* All school boards in the State of Michigan which, since March 24, 1972, have treated or now treat pregnancy related disabilities differently than other temporary disabilities, limited to the school boards in districts wherein the MEA has female members who have been or will be subject to such policies or practices.

*Plaintiff class:* All female teachers of such school boards who have been since March 24, 1972 or will be in the future, denied the benefits of a sick leave policy which treats pregnancy related disabilities the same as other temporary disabilities.

2. Defendants' motions for severance are denied.

3. The motions to dismiss the MEA and WEA for lack of standing are denied.

4. The motions to dismiss all monetary claims, such motions being grounded on the Eleventh Amendment, are denied.

5. The motions to dismiss the Title VII claims against individual board members and administrators who were not named in charges filed with the EEOC are granted.

6. The motion to dismiss the Title VII claims against MASB is granted insofar as such claims are independent of relief sought solely to effectuate declaratory and injunctive orders against the defendant's class.

MASB is still a proper party for the purposes of—(i) effectuating any declaratory and injunctive relief against the defendant's class and (ii) representing its members who are within the defendant class.

7. The motions to dismiss the § 1983 claims against board members and administrators because they are not "persons" are denied.

8. The motions to dismiss the § 1983 claims against the school boards themselves are granted. However, the Fourteenth Amendment claims against these defendants are not dismissed, they being pendent to the Title VII claims.

9. Determination of the other motions previously filed concerning the claims under 42 U.S.C. § 1983 and 20 U.S.C. § 1681 et seq. are deferred pursuant to Rule 12(d) of the Federal Rules of Civil Procedure.

The parties are directed to confer and agree upon a proper form of notice to be issued to members of both classes, and the most expeditious and inexpensive procedure for issuing such notice.

Defendants are further directed to answer the complaint within 20 days from the date of this order.

All parties are directed to confer forthwith and attempt to agree upon stipulations of facts.

IT IS SO ORDERED.

## APPENDIX

### What the Proposed New State Constitution Means to You

A report to the people of Michigan by their elected delegates to the Constitutional Convention of 1961–62.

### A PREFACE to the ADDRESS TO THE PEOPLE *

This introductory statement is intended to describe briefly the work of the Michigan Constitutional Convention and summarize what its delegates believe are among the most significant changes proposed for revision of the Michigan Constitution.

A detailed explanation of the revisions accompanies the complete text of the new document which follows this Preface. Sections eliminated from the present Constitution are listed separately in a concluding statement.

 * * * * * *

Almost no one alive today in Michigan has had the opportunity to vote on this question—"Do you approve a new state constitution?" No woman in the state has ever been previously qualified to ballot on the issue and no man under 75 years of age was old enough to vote in 1908, the last time the question was asked. Here, then, is almost literally a once-in-a-lifetime proposal.

How are you to make your decision on this important public issue? With the facts in this preface, and with the detailed discussion of each section of the proposed Constitution which follows, you have the means of

* Prepared in accordance with the requirements of Act No. 8 of the Public Acts of 1961, section 168.181 of the Compiled Laws of 1948, which reads in part as follows:

"The convention shall, before its adjournment, prepare and adopt an address to the people of the state, explaining the proposed changes in

acquainting yourself with the revised document.

The task of the delegates is done. The convention is adjourned. Now the people will decide the issue.

## Article VIII

### EDUCATION

**Principles.**

 Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

No change from Sec. 1, Article XI, of the present constitution.

**Legislative duty to public education.**

 Sec. 2. The legislature shall maintain and support a system of *free public elementary and secondary* schools *as defined by law.* * Every school district * * shall provide for the education of its pupils without *discrimination as to religion, creed, race, color or national origin.* * * *

This is a revision of Sec. 9, Article XI, of the present constitution which fixes responsibility on the legislature to provide "primary" education. To conform to present practice and court interpretations, "primary" is changed to "elementary and secondary". The balance of the section is excluded because its restrictions as to finance and definitions as to basic qualifications needed to be eligible for state aid are better left to legislative determination.

The anti-discrimination clause is placed in this section as a declaration which leaves no doubt as to where Michigan stands on this question.

the present constitution, and the reason for such changes, and such other matters as to the convention shall seem advisable. Not less than 25,000 copies of this address, in pamphlet form, containing the full text of the revised constitution, shall be printed and distributed as the convention shall direct."

### State board of education; superintendent of public instruction.

*Sec. 3. Leadership and general supervision over all public education, including adult education and instructional programs in state institutions, except as to institutions of higher education granting baccalaureate degrees, is vested in a state board of education. It shall serve as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith.*

*The state board of education shall appoint a superintendent of public instruction whose term of office shall be determined by the board. He shall be the chairman of the board without the right to vote, and shall be responsible for the execution of its policies. He shall be the principal executive officer of a state department of education which shall have powers and duties provided by law.*

*The state board of education shall consist of eight members who shall be nominated by party conventions and elected at large for terms of eight years as prescribed by law. The governor shall fill any vacancy by appointment for the unexpired term. The governor shall be ex-officio a member of the state board of education without the right to vote.*

*The power of the boards of institutions of higher education provided in this constitution to supervise their respective institutions and control and direct the expenditure of the institutions' funds shall not be limited by this section.*

This is a new section combining and enlarging upon the provisions in Sections 2 and 6, Article XI, of the present constitution. It attempts to embody two fundamental principles: (1) the concern of all people in educational processes as a safeguard for democracy; (2) greater public participation in the operation of educational institutions.

The enlarged state board provides a policy-making body on a state level. Michigan is one of three states that does not have such a board. Creation of a state board places the superintendent in the position of having constantly available a consultative and deliberative body of outstanding citizens who are representative of the people of the state.

Eight elected members have been selected as the number for the board because experience in other states has proved this to be a desirable size for a body of this nature. The legislature shall provide for the election of board members for overlapping 8-year terms to maintain continuity in education policies. Board members would be nominated at party conventions and elected at large by voters of the state. The governor would be a member ex officio of the state board of education in order to provide a close relationship between the executive branch of state government and the field of public education. He would have no vote in determining board decisions.

It is proposed that the board be the unifying and coordinating force for education within the state and receive information from all of the various levels of public education. Such information would be considered by the board in determining advice to local school boards, governing boards of colleges and universities and the legislature as to the total needs of education in this state.

Appointment of the superintendent of public instruction by the state board follows present day trends in other states and would assure selection from among the most competent people available. Michigan elects its superintendent under the present constitution. The superintendent would be considered as administrative head of the state department of education and as such should be a staff officer to the governor and on his administrative board.

The concluding paragraph of the section preserves for boards of institutions of higher education the power to supervise their respective institutions and control and direct the expenditure of their funds as at present.

\* \* \* \* \* \*

## MICHIGAN ASSOCIATION OF SCHOOL BOARDS

421 W. Kalamazoo Street,
Lansing, Michigan 48933
(517)371-5700

Deft. Exhibit No. __29__

Date __4-16-76__ Dep. Clk. __WD__

MASB means equal education opportunities for the youth of Michigan through better informed school boards.

### WHAT IS THE M.A.S.B.

The Michigan Association of School Boards is a nonprofit corporation. Any public school district may become a member of the Association. It was founded April 19, 1949 to work with and through local boards of education toward the improvement of learning opportunities for the children of Michigan. Member boards now serve over 99% of Michigan's pupil enrollment.

M.A.S.B. is made up of three bodies, i. e.

The entire membership, with each local board having one to four votes according to size of districts on (a) The Associations posture expressed through resolutions and (b) any modification of By-Laws. Such actions are taken at the Delegate Assembly held annually or at a special delegate assembly called by the Board of Directors.

The Board of Directors consist of 21 members. Two are elected from each of the Groups I–VI, and one from Group VII of school district membership within the organization. Eight members are elected at-large by the total membership. Groupings are determined by size of school enrollment according to MASB By-Laws. The Executive Committee consists of nine members, i. e., President, Vice President and 7 Directors elected from among the directors, one from each Group. The Executive Committee is em-powered to act in the absence of the Board of Directors.

Association committees, composed of interested board members, study particular issues and recommend courses of action. The following standing committees are maintained: Public Relations; Publications; Ad Hoc School Finance; Legal Trust Fund; Ways and Means; Organizations and Objectives; Member Services; MASB Collective Bargaining; Ethics and Management; Resolutions, By-Laws and Policies; Nominations; Conferences and Conventions; and Academies.

Staff members of the Association and/or board members attend all hearings, conferences and meetings where the interests of board members are involved or where it is desirable that the school board point of view be presented.

### INFORMATION SERVICES

Through regular and special publications, the Association's board members are supplied with pertinent information regarding education activities and thinking in Michigan and across the nation.

Association news and school boards' positions on relevant matters are conveyed to the general public through prepared public service spots, releases to the press and staff contact with members of the media.

Direct Services to Members

Phone and personal consultation with boards of education to aid in all areas of concern to local board members

Availability of staff members to speak at various educational and community functions

Development or updating of Board policies, job descriptions, millage campaigns, staff evaluation, and procedures for selecting a superintendent. MASB offers phone and personal consultation in any of these areas as well as assistance in obtaining related materials.

Publications

Michigan School Board Journal—The official Journal of the Association which presents the latest educational thinking and trends

Board-O-Gram—A biweekly newsletter that highlights MASB happenings and educational news

Miscellaneous booklets and pamphlets dealing with specific subjects

## GOVERNMENTAL RELATIONS

The chief responsibility of the Governmental Relations Service is to keep informed and inform MASB members of legislative activity. Staff members of the MASB meet regularly with legislators to present the school boards point of view and to provide them with relevant information. Staff members are present at all sessions of the State Senate and House of Representatives and regularly attend meetings of the education committees, appropriations committees, taxation committees, judiciary committees, labor committees and the State Board of Education. Testimony is prepared and delivered at appropriate hearings of the Legislature. Major bills relating to education are continually studied and analyzed. The MASB also serves as liaison with state administrative agencies and other educational organizations.

Direct Services to Members

Analysis or status of major pieces of legislation effecting education upon request

Response to questions pertaining to legislation

Assistance in obtaining any requested materials

Attendance at local or regional board meetings upon request to discuss legislation

Publications

Headlines—A detailed newsletter published biweekly covering pertinent legislation, actions of the State Board of Education and other relevant issues.

## LABOR RELATIONS

The Labor Relations Service maintains an expert staff and the necessary resource materials to aid local boards in all aspects of the labor relations and negotiations processes. Developments, research and trends in these areas are monitored by the staff and reported to Association members.

Direct Services to Members

Consultation service which includes research on specific questions

Consultation in the selection of individuals for fact-finding and arbitration

Copies of Tenure Commission Decisions and Orders

Services For A Fee

Contract negotiating service for across-the-table bargaining and related services

Employer representation in arbitration proceedings as the final step of the grievance procedure

Critical examination of Board contracts with recommendations for school management proposals for succeeding contract talks

Analysis for the Board of teacher contract proposals and rationale for Board position regarding those proposals.

Publications:

"Table Talk"—A biweekly report on current events in personnel relations, tenure, arbitration, contract administration, unfair labor charges.

MASB Contract Settlement Report—This gives teacher contract salary and fringe benefit information for all participating school districts.

## CONFERENCES AND CONVENTIONS

MASB believes organized and formal training programs are not only justifiable, but necessary for effectual educational leadership.

In addition to staff assistance for local and intermediate boards in aiding them with individualized training programs, MASB also has a well balanced schedule of Conventions, Conferences, Seminars (in-depth training for particular areas such as Evaluation, PR, Goals and Objectives, Negotiations, etc.) Workshops (Orientation for new board members, presidents and secretaries). These varied functions are designed to speak to specific needs of board members.

## LEGAL TRUST FUND

Any school district which is a member of the MASB, is eligible for membership in the MASB–LTF on a voluntary basis upon paying an established membership fee.

The LTF is governed by seven trustees who are appointed by MASB Board of Directors from member school districts of the Legal Trust Fund.

Function of the Legal Trust Fund Board of Trustees:

Review applications requesting aid and assistance in school district litigation

Develop criteria for MASB–Legal Trust Fund participation in litigation or other forms of controversy ·

Grant funds or render any other aid or assistance

Publication

Annual reporting of action taken

### LEGAL RELATIONS

MASB has an attorney on staff and maintains a library of materials widely utilized by school boards, school administrators and school district's legal counsel throughout the state. This includes a library of arbitration cases, and information on arbitrators, a complete library of tenure commission rulings, and a library of court cases affecting education.

Direct Services to Members

The MASB staff gives assistance to member boards in locating legal sources and gaining legal opinions.

Publications on Request

Supreme Circuit Court and Court of Appeals Decisions

Rulings from the State Labor Commission

Attorney General's Opinion

Statistical tables of estimated enrollment and other selected data

### STAFF

Executive Director
Norman P. Weinheimer

Assistant Executive Director
For Labor Relations
Harry W. Bishop

Deputy Executive Director
Varl O. Wilkinson

Assistant Executive Director
For State and Federal Relations
David M Ruhala

Administrative Assistant
For Public Affairs
Patricia Hershey

Labor Consultants
James Greene
Kevin Harty
Hugh Casey
George Johnson
Gary Collins

Research Assistant
Mary Ann Evert

## MASB INSURANCE AND AFFILIATE INSURANCE SERVICES

Each individual member of a MASB member board is covered by a Group Liability Insurance with limits of $500,000 at no additional cost to him or his board. This insurance is designed to protect the board member for his individual actions as a result of his being a board member; it does not cover the board for specific official actions of the board.

Services Provided Through MASB–SET and MASB–SEG

Phone and personal consultation for boards of education in the following areas:

Health Insurance (ULTRAMED)

Dental Insurance (ULTRADENT)

Vision Care

Long-Term Disability (Managed Sick Leave)

Group-Term Life Insurance

Dependent Life

Survivor Income

Travel Accident

Liability

Property and Casualty

Fringe Benefit Package

Two insurance affiliates are the vehicle to provide special group insurance programs for members of MASB and its employees. Through our nonprofit insurance affiliate, MASB–SET, local boards are able to place fringe benefit insurance for employees in MASB insurance programs. The MASB term life program has returned to local districts over $½ million dollars in dividends.

MASB–SEG Casualty and Fire Program is a newly established group insurance program for fire and casualty insurance through INA with $67,000 dollars of divi-

dends paid to participating districts during the first year.